Frank BOLDUC and Francis
Larkin, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. CIV.A. 01–11376–PBS.

United States District Court,
D. Massachusetts.

July 2, 2003.

See also 2002 WL 1760882.

Stephen B. Hrones, Hrones & Harwood,
Boston, for Frank Bolduc, Francis Larkin,
Plaintiffs.

Roberta T. Brown, Anita Johnson, United States Attorney's Office, Boston, for USA, Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### Introduction

Plaintiffs Frank Bolduc and Francis Larkin[1] bring this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1364(b), 2671–80 (2002), alleging they spent eight years serving prison sentences for crimes they did not commit—the attempted robbery of one Wisconsin bank (the "Southgate bank") and the robbery of another (the "Oklahoma Avenue bank")—because of the negligence of the Federal Bureau of Investigation. Now exonerated by the confessions of the real "Trench Coat Robbers," Bolduc and Larkin claim that FBI Special Agent Daniel S. Craft negligently failed to give the federal prosecutors exculpatory evidence that three eyewitnesses to the attempted robbery of the Southgate bank had identified other people as the culprits, and that Craft's superiors negligently supervised him.

This case raises several difficult legal questions, including whether Wisconsin law, which the FTCA incorporates here as the "law of the place," see 28 U.S.C. § 1346(b), allows for a negligence claim against law-enforcement personnel for mishandling investigative reports, and whether the FTCA's "discretionary function" exception, see 28 U.S.C. 2680(a), bars such a claim against a law-enforcement officer. But the Court need not reach these legal questions, in light of its factual findings.

After trial, the Court concludes that the FBI likely failed to provide the exculpatory evidence on the Southgate bank robbery to the prosecutors or defense attorneys before the trial of Bolduc and Larkin. Plaintiffs, however, did not prove that the FBI's failure caused them harm, because while the exculpatory Southgate evidence probably would have resulted in an acquittal on the Southgate charges, plaintiffs have not shown that the Southgate evidence likely would have effected an acquittal on the Oklahoma Avenue charges, which themselves carried lengthy prison sentences. Moreover, even if Bolduc and Larkin had been acquitted on all charges in Wisconsin, they would have been prosecuted and convicted for the robbery of an armored car in Chelmsford, Massachusetts. In short, Bolduc and Larkin would have spent the same amount of time in jail, even had they been given the exculpatory Southgate evidence.

With that said, the FBI's actions in the Wisconsin bank-robbery cases left much to be desired. Agent Craft likely intentionally withdrew another FBI agent's reports from the Wisconsin case file, and also negligently failed to send his own reports to the case file. The FBI's subsequent investigation of this matter was deficient: Six days after Craft voluntarily retired from the FBI on January 3, 2003, investigators advised closure of the investigation, stating, "captioned employee [Craft] retired (voluntarily) from the FBI, while under administrative inquiry, effective close of business 1/3/03. Therefore, it is recommended that captioned investigation/adjudication be closed prior to completion." (Pls.' Ex. 19.) Though Craft claims his retirement had nothing to do with the investigation into his conduct, his retirement was abrupt; as of October 2002, he had no intention of retiring. The investi-

---

**1.** Larkin died during the litigation and the administrator of his estate has been substitut-ed as a party.

gation was closed "without findings" after Craft's retirement. The FBI should be more accountable in investigating a failure to turn over exculpatory evidence in a serious criminal prosecution.

### Findings of Fact

## I. The Wisconsin Bank Cases

### A. The Attempted Robbery of the Southgate Bank

On June 28, 1988, two middle-aged white men attempted to rob the First Wisconsin Bank at the Southgate Mall in Greenfield, Wisconsin. They failed, because the vault had already been locked for the night.

The FBI case agent in charge of the investigation was Agent Craft. Craft was assisted by a new Special Agent, Derrel S. Craig, who had been on the job just a few weeks. Craft was the acting supervisor of the Milwaukee bank-robbery unit, and he supervised Craig. Craft considered the Southgate robbery a "nothing robbery" because there was no loss to the bank. Because so little was at stake, Craft initially let Craig "run with" the investigation. Craft, however, reviewed and initialed all investigative reports—"302 reports," in FBI parlance—before the reports became part of the official file for the Southgate case.

As background, Craft was a committed agent who was willing to violate FBI policies when he believed it was in the interest of justice. For example, he violated FBI policies in order to get a confession in an investigation involving the murder of a child in Minnesota.

### 1. The Eyewitness–Identification 302 Reports

On November 15, 1988, Agents Craft and Craig showed a photographic array of possible suspects to four eyewitnesses from the Southgate bank: Michael Dams, Robert Wesolowski, Jami Wiseman (now Radtke), and Judith Webb. None of the photographs depicted Bolduc or Larkin, or the men who turned out to be the actual culprits. Dams and Wesolowski identified the photographs of Allan Daniel Wilwerding and Douglas Wayne Thompson as the individuals who had attempted to rob the bank. Wiseman identified Wilwerding. Judith Webb identified nobody.

Craft and Craig dictated 302 reports describing the identifications by Dams, Wesolowski, and Wiseman; the reports state they were transcribed on November 30, 1988. *Two* sets of 302 reports were generated: one by Craft, and one by Craig. The two sets of reports differed in the degree of certitude attributed to the witnesses' identifications: Craig's reports stated the witnesses identified Wilwerding and Thompson as "identical" to the culprits, while Craft's reports stated that the witnesses identified Wilwerding and Thompson as "similar" to the culprits. For example, Craig's 302 report for Wesolowski stated:

> The following photo spread was shown to ROBERT WESOLOWSKI, Manager, First Wisconsin Bank, Southgate, in attempt to identify the unknown subjects (unsubs) who robbed that institution on June 28, 1988. After viewing the below listed photographs, WESOLOWSKI identified the photograph of ALLAN DANIEL WILWERDING and DOUGLAS WAYNE THOMPSON as being identical with the two individuals who robbed them on June 28, 1988:
>
> MANFORD WILBER SCHMIDT, ROBERT WOLFGANG SCHMIDT, JACK KUPPER, PATRICK MICHAEL MITCHELL, DOUGLAS WAYNE THOMPSON, ALLAN DANIEL WILWERDING, and MICHAEL SAVAGE.

After identifying the photos of THOMPSON and WILWERDING, WESOLOWSKI initialed and dated the back of the two photographs.

(Pls.' Ex. 1.) In contrast, Craft's 302 report for Wesolowski stated:

The following photo spread was shown to ROBERT WESOLOWSKI, Manager, FIRST WISCONSIN BANK SOUTHGATE, in an attempt to identify the unknown subjects (unsubs) who robbed that institution on June 28, 1988. After viewing the below-listed photographs, WESOLOWSKI advised that the photographs of ALLAN DANIEL WILWERDING and DOUGLAS WAYNE THOMPSON appeared similar to the individuals who robbed them on June 28, 1988:

> MANFRED WILBER SCHMIDT
> ROBERT WOLFGANG SCHMIDT
> JACK KUPPER
> PATRICK MICHAEL MITCHELL
> DOUGLAS WAYNE THOMPSON
> ALLAN DANIEL WILWERDING
> MICHAEL SAVAGE

WESOLOWSKI stated that this is not a positive identification but only that these two individuals resembled the two unsubs who robbed the FIRST WISCONSIN BANK on June 28, 1988.

(*Id.*) The same discrepancy as to certitude existed in the 302 reports for Dams and Wiseman.[2]

It is unclear which set of 302 reports accurately depicted the identifications. Craft's photo-array practice was to request an eyewitness to place a full signature on the back of a photograph if it was "identi-cal" to the culprit, but to initial the back of a photograph if the photograph was "similar" to the culprit—and Dams, Wesolowski, and Radtke initialed but did not sign the back of the photographs that they selected. It is unknown, however, whether Craft or Craig asked the witnesses to initial the photographs, and it is also unknown whether Craig attached the same significance to initialing as Craft did. Craft's practice was not universal at the FBI, or even in the Milwaukee bank-robbery unit; for example, Special Agent Margaret Cronin, who was involved in investigating the Oklahoma Avenue bank robbery (discussed below), asks eyewitnesses to sign *or* initial a photograph if it is "identical" to the culprit.

Several air telegrams ("airtels") from the Milwaukee FBI office to other FBI offices were both contemporaneous and consistent with the *Craig* 302 reports. On November 30, 1988—the same day the Craig and Craft 302 reports were transcribed—the Milwaukee FBI office sent an airtel to the Omaha FBI office (with copies to several other FBI offices, including Minneapolis) regarding the Southgate robbery. The airtel stated:

> On 11/15/88, Milwaukee Division showed photo spreads containing [REDACTED] and two of the witnesses selected [REDACTED] as being *identical* with the unsubs [unidentified subjects] in captioned Milwaukee robbery. A third witness selected the photograph of [REDACTED] as being *identical* with one of the unsubs. Milwaukee Division is in the process of attempting to obtain additional corroborating evidence before

---

2. One of Craig's 302 reports began by stating that a "photo spread was shown to MICHAEL DAMS," but later referred to the witness as "WESOLOWSKI." (Pls.' Ex. 1.) In an affidavit (Pls.' Ex. 21), Craig stated that the references to Wesolowski were clerical mistakes, and that the report reflected Dams's identifications; Craig's position is supported by the existence of a separate 302 report for Wesolowski. The Court finds that the references to Wesolowski in the Dams report were clerical errors.

charging [REDACTED] with captioned robbery.

(Pls.' Ex. 7 at 2) (emphases added.) On December 2, 1988, the Milwaukee FBI office sent an airtel to the Minneapolis FBI office that repeated the "identical" characterization of the identifications. (Pls.' Ex. 6 at 2.) The December 2, 1988 airtel also noted that the Milwaukee office would be sending the "pertinent" 302 reports to Minneapolis. (*Id.* at 3.) The Milwaukee office sent the Craig 302 reports to Minneapolis.

## 2. Agent Craft's Handling of the 302 Reports

The FBI trains its agents to place all finalized (*i.e.*, non-rough-draft) 302 reports in a case file, and to give the entire case file to the United States Attorney's office. According to FBI policy, agents have no discretion in these matters.

Craft's practice was to send all 302 reports that he initialed to the case file. Remarkably, Craft believed that FBI reports containing "similar-to" identifications of persons other than the defendant were not exculpatory, but he nonetheless sent such reports to the case file (as required by FBI policy). In the Milwaukee FBI office, supervisors (like Craft) gave initialed 302 reports to a "rotor" clerk, who filed the reports in the case file. Initialing a 302 report supposedly signified that Craft had reviewed the report, and deemed it finalized. By his own admission, however, Craft "cut corners" at times, and did not read all reports before initialing them. Craft's supervisor, Johnny Went, repeatedly criticized Craft for failing to pay sufficient attention to paperwork, including 302 reports.

In the Southgate case, Craft was the gatekeeper for the case file. He initialed all of the 302 reports for the Dams, Wesolowski, and Wiseman photo-array identifica-

tions, including those generated by Agent Craig. Because Craft initialed all of those 302 reports, both the Craig and the Craft 302 reports should have been sent to the case file.

But it is undisputed that the Craig 302 reports were not in the case file that was made available to the prosecutors prior to the trial of Bolduc and Larkin. The Court finds that Craft likely removed Craig's 302 reports from the FBI rotor file prior to presenting it to the prosecutors, because Craft believed Craig's reports did not accurately reflect the strength of the witnesses' identifications of Wilwerding and Thompson. Craft believed that his own 302 reports accurately captured the substance of the witnesses' identifications.

It is doubtful that even the Craft 302 reports were in the case file when it was made available to the prosecutors. At his deposition, former Assistant United States Attorney Stephen Liccione, the lead prosecutor in the trial of Bolduc and Larkin, recalled that he had learned prior to trial that Southgate witnesses identified other people as the robbers, but he did not have a specific recollection of having documentary evidence (*i.e.*, 302 reports) of these identifications. Assistant United States Attorney Matthew Jacobs, the other prosecutor, recalled learning of the Craft and Craig 302 reports *after* trial. It was the prosecutors' practice to turn over the entire case file to defense counsel, and Bolduc's attorney, Robert Lerner, who was an experienced criminal-defense attorney and a former Assistant United States Attorney, testified at his deposition that he did not recall receiving either the Craig or the Craft 302 reports. Lerner pointed to the absence of the 302 reports from his files, and his failure to use the 302 reports at trial. It is indeed inconceivable that an experienced defense counsel like Lerner would not have used either set of reports

to impeach the corresponding eyewitnesses. The odds of *two* defense attorneys (Lerner and Larkin's attorney) failing to use the reports are *de minimus.*

In accordance with the weight of the evidence, the Court finds that Agent Craft likely failed to transmit the Craft 302 reports to the case file made available to the United States Attorney's Office—and which the United States Attorney's Office, in turn, made available to Bolduc's and Larkin's counsel—prior to the trial of Bolduc and Larkin. However, here the evidence does not support an intentional failure, but rather mere negligence.

**B. The Robbery of the Oklahoma Avenue Bank**

On October 18, 1989, two middle-aged white men robbed another First Wisconsin Bank, on Oklahoma Avenue in Milwaukee, stealing $400,000. As with the Southgate bank case, Agent Craft led the investigation into the Oklahoma Avenue bank robbery, assisted by Agent Cronin (who had not been involved in the Southgate investigation).

**C. The Round Up of the Usual Suspects**

Cronin, a Boston native, kept abreast of events in her hometown by reading the Boston newspapers. Shortly after the Oklahoma Avenue robbery, she read an article in a Boston paper describing the arrests of Bolduc, Larkin, and two other individuals for their alleged roles in robbing an armored car in Chelmsford, Massachusetts. Cronin observed that Bolduc and Larkin were middle-aged white men, matching the eyewitness descriptions of the culprits at the Southgate and Oklahoma Avenue banks. Cronin believed middle-aged bank robbers were rare birds, and decided to propose showing Bolduc's and Larkin's photographs to the eyewitnesses for the Wisconsin bank cases.

On Cronin's initiative, in early 1990 the Milwaukee FBI showed various eyewitnesses an array of photographs that included pictures of Bolduc and Larkin. Several eyewitnesses selected the photographs of Bolduc and/or Larkin; several others did not. On August 6, 1990, federal officials obtained custody of Bolduc and Larkin from Massachusetts authorities—who were holding Bolduc and Larkin for the Chelmsford robbery—via a writ of habeas corpus ad prosequendum.[3]

On August 21, 1990, Bolduc and Larkin appeared before a federal grand jury in Milwaukee, and the grand jury ordered them to participate in a line-up later that day. Six individuals were in the line-up. Bolduc and Larkin were the only members of the line-up that had also had their pictures in a photo array shown to the eyewitnesses from the First Wisconsin banks. All of the individuals in the line-up were asked to say certain phrases; only Bolduc and Larkin had non-Wisconsin accents.[4] Several of the eyewitnesses identified Larkin and Bolduc. Several others could not identify anyone. One eyewitness identified someone other than Bolduc and Larkin.

---

**3.** In *United States v. Larkin,* 978 F.2d 964, 967–69 (7th Cir.1992), the Seventh Circuit held that the federal officials should have used a writ of habeas corpus ad testificandum to gain custody over Bolduc and Larkin, but that this error did not prejudice Bolduc and Larkin.

**4.** In *Larkin,* the Seventh Circuit held that "while the lineup procedures were less than optimal, the totality of the circumstances overcomes any contention that the alleged defects in the lineup procedures rendered the lineup identifications so unreliable as to violate due process." 978 F.2d at 970–71.

Three months after the line-up, Bolduc and Larkin were indicted for four crimes: the attempted armed robbery at Southgate, firearm use during the attempted robbery at Southgate, the armed robbery at Oklahoma Avenue, and firearm use during the robbery at Oklahoma Avenue.[5]

### D. The Trial of Bolduc and Larkin

In February 1991, Bolduc and Larkin were tried for the Wisconsin crimes in a single trial, presided over by Judge Thomas Curran. The prosecution's evidence consisted solely of eyewitness identifications of Bolduc and Larkin. The defense presented eyewitnesses from the two banks who were unable to identify Bolduc and Larkin, and also called several alibi eyewitnesses.

#### 1. The Oklahoma Avenue Eyewitnesses

The Oklahoma Avenue eyewitnesses agreed that there had been a taller robber and a shorter robber. Those that identified Bolduc and Larkin as the robbers identified Larkin as the taller and Bolduc as the shorter. Though not all witnesses gave the same details as to the robbers' descriptions, the consensus was that the robbers carried guns and wore trench coats, hats, tinted glasses, and makeup. Many of the witnesses described the robbers as having accents; several witnesses characterized the accents as "southern." The witnesses described how the robbers gathered them together in a room and bound them with flexible plastic bands.

Of the eleven Oklahoma Avenue eyewitnesses that were called by the prosecution and the defense, two identified both Bolduc and Larkin, three identified only Bolduc, two identified only Larkin, and four could not identify either Bolduc or Larkin. Key points from their testimony are set out below. (For simplicity, witnesses are grouped by whom they identified, *e.g.*, both Bolduc and Larkin.)

#### a. Patricia Dolata

Patricia Dolata identified both Bolduc and Larkin at trial and at the August 1990 lineup, but failed to select either Bolduc's or Larkin's photo from a photo array she was shown before trial.

#### b. Heidi Pratt

Heidi Pratt identified both Bolduc and Larkin at trial, testifying that there was no question whatsoever that Bolduc and Larkin were the robbers. She did not identify them at the August 1990 line-up.

#### c. James Anick

James Anick identified Bolduc at trial and at the August 1990 line-up. Anick testified at trial "He pointed a gun in my face, I'll never forget this." (Trial Tr., Pls.' Ex. 13, at 260.)

#### d. Sue Wilsey

Sue Wilsey identified Bolduc a trial and at the August 1990 line-up. She said she was "very certain" that Bolduc was the shorter robber. (*Id.* at 297.)

#### e. Deborah Turner

Deborah Turner identified Bolduc at trial and at the August 1990 line-up. Turner stated that she was able to identify Bolduc at the line-up because she "will never forget his face as long as [she] live[s], and [she] just looked at him and [she] knew immediately that it was him." (*Id.* at 343.)

---

**5.** Larkin was also indicted for the robbery of a bank in Green Bay, Wisconsin, but this charge was later dismissed.

#### f. Mary Mankowski

Mary Mankowski identified Larkin at trial and at a August 1990 lineup, although she conceded that she "d[id] not believe that the [taller robber] had a Boston accent. And if I had to close my eyes and pick them, I would not have picked [Larkin] on his voice." (*Id.* at 136.)

#### g. Kay LaRue

Kay LaRue identified Larkin at trial and at the August 1990 line-up; she also identified another man (not Bolduc) at the line-up.

#### h. Carol Smallish

Carol Smallish could not identify either Bolduc or Larkin at trial.

#### i. Debra Dentice

Debra Dentice could not identify either Bolduc or Larkin at trial or at the August 1990 line-up.

#### j. Joan Mabrey

Joan Mabrey could not identify either Bolduc or Larkin at trial or at the August 1990 line-up.

#### k. Mardell Lazaris

Mardell Lazaris could not identify either Bolduc or Larkin at trial or at the August 1990 line-up.

#### 2. The Southgate Eyewitnesses

The eyewitnesses to the attempted robbery at Southgate testified that the culprits had been a taller man and a shorter man. Those that identified Bolduc and Larkin pegged Larkin as the taller and Bolduc as the shorter. Though the witnesses varied somewhat on the details of the perpetrators' descriptions, the consensus was that the shorter man carried a gun and wore a suit, a hat, and tinted glasses, and that the taller man wore a suit, wig, and make-up. The witnesses described how the robbers gathered them together in a room and bound them with flexible plastic bands.

Of the five Southgate eyewitnesses called by the prosecution and the defense, three identified both Bolduc and Larkin, one identified only Bolduc, and one identified neither. Key points from their testimony are set out below. (Again, witnesses are grouped by whom they identified.)

#### a. Judith Webb

Judith Webb identified Bolduc and Larkin at trial, and earlier selected their pictures from a photo array. Webb did not attend the August 1990 line-up.

#### b. Michael Dams

Michael Dams identified Bolduc and Larkin at trial and at the August 1990 line-up, and also earlier selected Bolduc's picture from a photo array. Dams testified at trial that he had not been shown any pictures by the FBI until January 1990. (This was incorrect, as the Craig and Craft 302 reports show that Dams identified other suspects in 1988.)

#### c. Robert Wesolowski

Robert Wesolowski identified Bolduc and Larkin at trial, and earlier selected Larkin's picture from a photo array. At the August 1990 line-up, however, Wesolowski could not identify either Bolduc or Larkin, because their accents did not seem consistent with his memory of the robbers; after the line-up, however, Wesolowski decided to identify Bolduc and Larkin notwithstanding the accent discrepancy. (The Craig and Craft 302 reports show that Wesolowski identified other suspects in 1988.)

### d. Jami Radtke

Jami Radtke (née Wiseman) identified Bolduc at trial and earlier selected his picture from a photo array; she did not attend the August 1990 line-up. Radtke expressed certainty that Bolduc was one of men that attempted to rob the Southgate bank:

> Q: I note you say you were able to identify at least one of the robbers. Is that right?
>
> A: Yes.
>
> Q: How is it you are able to do that?
>
> A: Because I'll never forget his face. Ever.

(*Id.* at 402.) Radtke testified at trial that she had not been shown any photographs in 1988. (This was incorrect, as the Craig and Craft 302 reports show that Radtke identified another suspect in 1988.)

### e. George Reister

At trial, George Reister could not identify Bolduc or Larkin.

### 3. Alibi Witnesses

Bolduc introduced the testimony of various alibi witnesses. David Clark, the building superintendent at the Old South Church in Boston, where Bolduc was an employee in June of 1988, testified that the church's payroll records indicated that Bolduc worked the week of the Southgate robbery. Claire Maslauskas, Bolduc's girlfriend, testified that Bolduc and she lived together in Boston and identified sales receipts dated June 29, 1988 (the day after the Southgate robbery) to prove their purchase of certain furniture at a mall outside of Boston. Maslauskas also testified that Bolduc had been in Boston in October 1989 (when the Oklahoma Avenue robbery occurred). Janet Verisotosky, a co-worker of Maslauskas, testified that on October 18, 1989, Bolduc gave Verisotosky a ride home from work; she remembered the date because her mother's birthday was the day before. John O'Meara, a friend of Bolduc, testified that he spent a good part of October 18, 1989 with Bolduc in Boston. John McGrath, another friend of Bolduc, testified that in October of 1989, he placed several collect calls to Bolduc, including one call on October 19, 1989. The defense introduced phone records showing a collect call was made to Bolduc's and Maslauskas's phone number on that date.

Larkin had one alibi witness: Sean Lally, a friend of Larkin from Boston. Lally testified that he met Larkin in March of 1988, and that Larkin moved in with him shortly thereafter, and stayed with Lally until October of 1989. He recalled hosting a birthday party for Larkin on June 24, 1988, and watching the World Series with Larkin on October 17, 1989 when an earthquake hit California.

### 4. The Verdict and the Sentencing

On February 26, 1991, the jury found Bolduc and Larkin guilty of all charges, and on May 24, 1991, Judge Thomas Curran sentenced Bolduc and Larkin. Judge Curran sentenced Bolduc to 280 months for count one (attempted robbery at Southgate), 60 months for count two (use of a firearm at Southgate), 280 months for count three (robbery at Oklahoma Avenue), and 240 months for count four (use of a firearm at Oklahoma Avenue). The sentences for counts one and three were to run concurrently, followed by the sentence for count two, followed by the sentence for count four; the total was 580 months.

Bolduc's federal sentences were to run consecutively to the life sentence he was already serving in Massachusetts. Bolduc's life sentence was for violating his parole on a second-degree murder conviction. On November 2, 1988, the Massa-

chusetts parole board had found Bolduc violated his parole through his arrests in the Chelmsford armed-robbery case and Bolduc's "[a]ssociation with Frank Larkin, a person known to have a criminal record." (Def.' Ex. 123.) The federal officials in Wisconsin sent Bolduc back to Massachusetts to resume serving his life sentence.

Judge Curran sentenced Larkin to 90 months for count one, 60 months for count two, 90 months for count three, and 240 months for count four. The sentences for counts one and three were to run concurrently, followed by the sentence for count two, followed by the sentence for count four; the total was 390 months. Larkin's federal sentences were to commence upon the completion of any sentence in Massachusetts, but because Larkin was not serving any time in Massachusetts, he was sent to federal prison.

After learning that Bolduc and Larkin had been convicted in Wisconsin, in 1991 the Commonwealth of Massachusetts decided to enter nolle prosequis in the Chelmsford-armed-robbery cases against Bolduc and Larkin.[6] As justification, the Commonwealth pointed to the ages of Bolduc (54) and Larkin (57) and the length of the sentences already imposed on them, suggesting there was no need to seek additional prison time for the two men. While not discussed in the nolle-prosequi papers filed in court, the Commonwealth also had concerns about the defendants' right to a speedy trial.

### E. The Trench Coat Robbers

In the 1980s and 1990s, a team of two middle-aged white men dressed in trench coats went on the largest spree of bank robberies in American history; the press eventually dubbed the duo the "Trench Coat Robbers." At some point in late 1989 or early 1990, Agent Craft learned of the Trench–Coat–Robbers investigation, which the FBI had code-named "trench rob." Craft eventually became convinced that Bolduc and Larkin were the Trench Coat Robbers. But even after Bolduc and Larkin were tried and convicted, the robberies continued. Craft attributed their continuation to additional Trench Coat Robbers, or to copy-cat criminals.

On November 10, 1997, William Kirkpatrick was arrested as a suspect in the Trench Coat robberies; he was subsequently charged in Minnesota. Bolduc, who had been collecting information related to the Trench Coat robberies, wrote to Kirkpatrick's attorney (Robert Richman) in Minnesota, and offered to exchange Bolduc's information for any material Kirkpatrick had that might be relevant to Bolduc's case. Kirkpatrick's attorney sent Bolduc a packet that included Agent Craig's 302 reports of the November 1988 identifications by Dams, Wesolowski, and Wiseman; Kirkpatrick had received these reports from the Minneapolis FBI office.

Kirkpatrick eventually confessed to robbing the Southgate and Oklahoma Avenue banks with his partner Ray Bowman.[7] On June 3, 1999, Craft interviewed Kirkpatrick, and became convinced that Kirkpatrick and Bowman had robbed the Wisconsin banks. Now convinced Bolduc and Larkin were innocent, Craft was pro-active in procuring their release, relaying his be-

---

**6.** At some point, apparently, the Massachusetts parole board determined that Bolduc's convictions in Wisconsin constituted additional grounds for revoking his parole. This explains why Massachusetts authorities continued to hold Bolduc after the Commonwealth entered nolle prosequis in the Chelmsford case.

**7.** In *United States v. Bowman*, 215 F.3d 951 (9th Cir.2000), the Ninth Circuit discussed Kirkpatrick's and Bowman's bank-robbery partnership.

lief that they were innocent to the United States Attorney's Office in Milwaukee.

In light of Kirkpatrick's revelations, Bolduc and Larkin filed federal habeas corpus petitions. The United States did not oppose the petitions, and on June 11, 1999, Judge Curran vacated Bolduc's and Larkin's sentences and issued certificates of innocence to them. Larkin was released from federal custody that month. Bolduc, relying on the certification of innocence from Wisconsin and the nolle prosequi from the Chelmsford case, successfully argued to the Massachusetts parole board that he should be paroled; Bolduc was released in November 1999.

## II. The Chelmsford Armored–Car Case

At trial in this case, Assistant Middlesex County District Attorney Thomas O'Reilly testified that if Bolduc and Larkin had been acquitted by the jury in Wisconsin, the Commonwealth of Massachusetts would have prosecuted both for various crimes arising out of the armed robbery of an armored car in Chelmsford.[8] As discussed above, Bolduc and Larkin had earlier been indicted in that case, and were being held on those charges before federal authorities took them to Wisconsin. (O'Reilly stated that the FBI took the two men into custody without even telling the District Attorney's office or the defense attorneys where Bolduc and Larkin had gone.) The various Massachusetts charges included armed robbery and assault with intent to murder.

O'Reilly, the lead prosecutor in the case, named several witnesses he had intended to call at trial. Two of these witnesses, Officer Brian O'Neill and Officer Tim Leeman, testified at trial in this case. Both were highly credible witnesses, and the Court finds they would have given like testimony had the Commonwealth prosecuted Bolduc and Larkin.

■ As for the other witnesses O'Reilly intended to call, the government relies on contemporaneous police reports and witness statements as demonstrating the probable testimony had Bolduc and Larkin been tried. Plaintiffs object, arguing that these reports and statements are unreliable hearsay. The government properly notes, however, that the reports and statements are not being offered for the truth of the matters asserted, but rather to show what the authors of the reports and statements would have testified at trial. *See* Fed.R.Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted* ") (emphasis added); *cf. Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 818 (7th Cir.1994) (stating that in legal-malpractice trial where issue was whether plaintiff would have achieved a better outcome in an earlier trial with effective counsel, transcript from earlier trial should have been admissible, as it was not being offered for the truth of the testimony, but rather "to show that the testimony of the

---

**8.** At times during his testimony, O'Reilly suggested that the speedy-trial requirements of Massachusetts Rule of Criminal Procedure 36 may have presented an impediment to prosecuting Bolduc and Larkin, given the interruption in the case caused by the proceedings in Wisconsin. But at the end of his testimony, O'Reilly stated that the Commonwealth would have prevailed had defendants raised a speedy-trial argument. It appears that this last statement was correct, as Rule 36 allows for the exclusion from the speedy-trial calculus of "[a]ny period of delay resulting from other proceedings concerning the defendant" or of "[a]ny period of delay resulting from the ... unavailability of the defendant." *See* Mass. R.Crim. P. 36(b)(2). This provision of Rule 36 was in force during the relevant time period.

[opposing party in the earlier trial]'s witnesses, whether truthful or not, was so extensive and so damaging to [plaintiff] that it was most unlikely that anything [plaintiff's counsel] could have done would have succeeded in defeating a judgment for the [opposing party]").

■ Moreover, as this is a civil trial, the police reports, which recorded first-hand observations of officers, are admissible under the "public records and reports" exception to the hearsay rule. *See* Fed. R.Evid. 803(8). This exception allows for the admission of

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personal, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8). *See also Parsons v. Honeywell, Inc.,* 929 F.2d 901, 907 (2nd Cir.1991) (stating that in civil trials "[i]t is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted") (quoting *United States v. Pazsint,* 703 F.2d 420, 424 (9th Cir.1983)).

Relying on the live testimony of Officers O'Neill and Leeman, the police reports, and the witness statements, the Court will set out the key evidence that prosecutors likely would have presented against Bolduc and Larkin.

## A. Jeffrey Kievman

Jeffrey Kievman likely would have given the following testimony: At approximately 12:00 pm on November 1, 1989, Kievman was working as a messenger for Wells Fargo, making a delivery to a BayBank on Summer Street in Chelmsford. Kievman was traveling in a Wells Fargo truck driven by Arthur Sutherland. Sutherland parked the truck parallel to a ramp next to the BayBank. Kievman exited the side of the truck carrying four boxes of pennies, which he left on the side of the truck. He then went to the rear of the truck, opened the door, and removed several boxes of quarters and nickels, and a money bag containing $300,000.

When Kievman turned in the direction of the bank, he saw someone off to his side. The person may have said something to Kievman. Kievman then heard a bang, and realized he was shot. As he lay on the ground, screaming, he saw the shooter, who was wearing a dark ski mask. The shooter appeared tall (perhaps six feet) and lanky.

Kievman sat up, and saw a blue or gray four-door vehicle about fifteen or twenty feet away. Kievman saw the car's driver (who was not wearing a mask) and several other people moving about in the car. Kievman aimed his gun at the car, to try to shoot the person who had shot him. Kievman emptied his gun at the vehicle. He then collapsed and fell backward. The car left.

## B. Officer John Redican

Officer John Redican likely would have given the following testimony:[9] At ap-

---

9. Officer Redican filed two typed incident reports on the day of the armed robbery: one at 2:30 p.m., and another at 7:00 p.m. (The two reports are collected at Def.'s Ex. 110.) The

proximately 12:02 on November 1, 1989, Redican was stopped at a stop sign on the corner of Boston Road and Summer Street in Chelmsford. When Redican started down Summer Street, he heard a number of gunshots. He stopped his cruiser and looked toward the BayBank on Summer Street. He saw a two-tone gray car depart the BayBank at a high rate of speed, proceeding down Summer Street toward Billerica Road.

Redican observed one suspect—whom he later identified as Bolduc—hanging out the right rear of the car, with what appeared to be a .45 caliber automatic gun in his hand, aimed at Redican. Redican also observed another suspect—whom he later identified as Larkin—break out the rear window of the car with a carbine rifle, and aim the rifle at Redican's car. As Redican began to pursue the vehicle, several shots were fired at his car, with one shot piercing his windshield. (The Court takes these later identifications of Bolduc and Larkin with a grain of salt given the speed of the car and the distance involved.)

Redican followed the suspects' vehicle on to Route 110 (Chelmsford Road). As Redican turned onto Route 110, another police car (driven by Officer Mike Stott) joined the chase. The two police cruisers pursued the suspects down Route 110 toward Lowell. During the pursuit, one robber came out on the back trunk, and fired a rifle at the police cruisers.

Weaving in heavy traffic, the suspects' vehicle turned onto the entrance ramp for Route 495 northbound. Redican fired at the suspects twice, and then Scott and he followed them onto Route 495. The pursuit took place at speeds up to 90 miles per hour.

With the police following, the suspects took the Woburn Street exit off of Route 495. At the end of the exit ramp, the suspects' vehicle went out of control, hit a high curb, and came to rest between a pole and a stockade fence.

As Redican stopped his car, he saw Larkin in the street in a kneeling position, aiming his rifle at Redican. As Redican took cover, he heard shots. Redican came around the side of his cruiser, and saw three suspects (Bolduc, Larkin, and a man Redican later identified as Robert Burke) running behind the stockade fence.

Additional police officers arrived on the scene, and the police began an area search. During the search of the neighborhood, Redican saw Burke run across a street in front of his cruiser and then jump a fence. Redican was approached by a resident, who showed Redican a gun and said that someone had just broken into his house and left the gun behind. At that point, Redican observed Larkin standing on the front lawn of a house. Redican cautiously approached Larkin, placed him under arrest, handcuffed him, and placed him in Redican's cruiser.

After placing Larkin in the cruiser, Redican met up with Officer Ron Gamache and a state trooper, who had apprehended

later report was more detailed than the first; for example, the later report identified suspects by name. At some point after drafting the later report, Redican made some handwritten changes, substituting Larkin's actual name for his alias (Beaty) and correcting a few instances in which Bolduc's and Larkin's names had been transposed. Finally, on November 4, 1989, Redican supplemented his report with an addendum relating additional details about the events on November 1. In determining Redican's likely testimony had a trial taken place, the Court has relied on the final, corrected, supplemented report, which is consistent with the other police reports and witness statements and with O'Neill's and Leeman's live testimony. However, the Court also recognizes that the inconsistencies in Redican's reports could have been used for impeachment.

Bolduc. Redican and another officer transported Bolduc and Larkin to the police station.

Redican later viewed a photo array consisting of twelve photos, and after looking at the array for less than one minute, Redican identified Larkin, Bolduc, and Burke.

### C. Officer Michael Stott

Officer Michael Stott likely would have given the following testimony: On November 1, 1989, Stott heard a radio report from Officer Redican, in which Redican yelled that he was going down Summer Street toward Route 129 and that he was being shot at. Stott, who was at the intersection of Route 110 and Route 129, headed toward Summer Street.

As Stott approached the intersection, he saw a gray vehicle exit Summer Street at a high rate of speed, followed by Officer Redican's vehicle. Stott followed behind Redican. Stott heard what he thought was Redican's car backfiring, and passed Redican's car at the corner of Route 110 heading toward Lowell.

Stott saw a white male lie across the trunk of the white car with a rifle, and again heard the backfiring noise and what he initially thought were pebbles hitting his car. When he saw the rifle he realized what was happening, and he backed off. The chase continued on to Route 495. The gray vehicle continued shooting at Stott's car. The vehicle eventually took the Woburn Street exit, with Stott in pursuit.

As Stott went down the ramp, he saw two men standing with pistols aimed at him, and one man kneeling with a rifle aimed at him. The gray vehicle had crashed, and the shooters were beside the vehicle. Stott lay across the front seat and turned his car. He stopped the car, and when he looked up he saw the sus-

pects had left the crash scene. Stott approached the crashed vehicle. No one was in the car, but a bag of cash was on the passenger's side in the front of the vehicle.

### D. James Scannell

James Scannell likely would have given the following testimony: At just after 12:00 pm on November 1, 1989, James Scannell was leaving his house on 35 Christman Avenue in Lowell. As he was getting in his car, a man with an AK–47 rifle came running up to Scannell demanding his car keys. Scannell told the man that the keys were in the car. The man looked in the car, and saw that it was filled with boxes. As he was looking in the car, another man came running up from Woburn Street to Scannell's house; this second man did not appear to have a gun.

The man with the gun ordered Scannell to get in the house, motioning toward the front door. Scannell told him the door was locked. The man with the gun and his companion began leading Scannell toward a side door. While the three were stepping into the side door, Scannell ran off across the back yard. The man with the gun told him to stop or he would shoot. Scannell tripped and fell, and lay there for a moment, watching the two men go into the house.

Scannell got up and ran across the back yard and through his neighbor's yard. When he saw police cruisers on the street, he yelled to them that two men were in his house. He looked back down the street, and saw his brother William Scannell running up the street towards him and the cruisers, carrying the AK–47. The officers told the brothers to lie spread-eagle on the ground.

### E. William Scannell

William Scannell likely would have given the following testimony: On November 1,

1989, as William Scannell was coming out of his house at 35 Christman Avenue in Lowell, he heard someone ordering his brother James to turn over his car keys and get in the house. When he heard this, William went back inside the house. He looked out the window, and saw a man holding a rifle. William hid in the closet, where he heard the man outside yell, "Stop right now or I'll shoot you."

When William heard footsteps in the kitchen, he slowly came out of the closet with his hands up. As he did, he saw the man lean the rifle against the kitchen door. William tiptoed over, picked up the gun, came out the door, held up the gun, and yelled to his brother to run.

Two men were outside the door. When William yelled to his brother, the two men looked at William in apparent surprise, and at least one of the men ran. William then ran across the street with the rifle. He met up with James, and surrendered the rifle to the police.

### F. Officer Brian O'Neill

Officer O'Neill, who testified in this Court, likely would have given the following testimony at a trial of Bolduc and Larkin: On November 1, 1989, O'Neill (a state police trooper) was returning to his home in Lowell after having completing a court case in Worcester. O'Neill was riding with his fellow state trooper, Officer Leeman. As O'Neill drove down the off-ramp from Route 495 north to Route 110, he saw a two-tone gray Pontiac Bonneville with a rotating blue light on the dashboard, driving at an extremely high rate of speed onto the on-ramp from Route 110 to Route 495 north. O'Neill observed two marked Chelmsford police officers following the Bonneville to Route 495.

O'Neill turned around and went back on to Route 495 to join the chase. Leeman told O'Neill that he could see a rifle stick-ing out of the broken back window of the Bonneville, firing at the Chelmsford cruisers. O'Neill saw the Bonneville and the Chelmsford cruisers take the Woburn Street exit, but he could not safely take that exit. He took the next exit and proceeded to the area near the off-ramp the other cars had taken.

When he arrived at the area, O'Neill saw that a gray Pontiac had crashed into a fence on someone's property; the car appeared to be wedged between a telephone pole and the fence. O'Neill saw Officer Redican—whom O'Neill knew—pointing toward Christman Avenue. O'Neill took Redican's gesture as a signal to proceed to Christman Avenue, which O'Neill did.

On Christman Avenue, O'Neill saw three men facing in his direction, firing guns. O'Neill stopped the car about fifty yards from the men firing the guns. O'Neill thought he perceived police officers returning fire. He and Leeman exited the vehicle. O'Neill ran behind the trunk area of the car. As he did, he observed a man—whom O'Neill later identified as Bolduc—run up the driveway of a house, and O'Neill decided to give chase.

O'Neill was initially unsure whether Bolduc was a police officer or a suspect. He yelled to Bolduc, "What's going on?" This attracted the attention of Bolduc, who turned and fired a gun at O'Neill. O'Neill continued to pursue Bolduc through a backyard and over a fence.

In the next yard, Bolduc ran around a house. O'Neill and Leeman—who had joined the chase—went around different sides of the house. As O'Neill rounded a corner of the house, he found Bolduc standing behind the corner. Bolduc thrust his gun out and shot at O'Neill, but did not hit him. O'Neill ran back around the house, yelling to Leeman to warn him. O'Neill saw Leeman run around the house.

O'Neill took a wider pattern back around the house.

O'Neill emerged onto the street, where he ran into a woman's car. He asked the woman for ride, and (remarkably) she complied. She drove O'Neill back to Woburn Street and let him out. When he got out, he saw Bolduc in the street near where the Bonneville had crashed. Bolduc had jumped up on the side of a pickup truck and pointed his gun into the driver's-side window, ordering the driver to drive away. Bolduc was unable to lift himself into the back of the pickup truck, and as a result was hanging off the side.

O'Neill approached the truck from the rear and grabbed Bolduc. Bolduc spun around and pointed his gun at O'Neill. O'Neill grabbed the gun with his left hand, and grabbed Bolduc's throat with his right hand. Simultaneously, O'Neill ran at Bolduc, knocking him off the truck and onto the sidewalk. O'Neill put Bolduc's gun in his pocket. Trooper Leeman arrived at about the same time, and he assisted O'Neill in handcuffing Bolduc. As they handcuffed Bolduc, Bolduc threatened to kill them.

O'Neill and Leeman escorted Bolduc to the Chelmsford police, who took Bolduc to the police station. (A picture of Bolduc in the police station corroborated O'Neill's testimony on this score, as the picture showed red marks on Bolduc). While still at the scene, O'Neill looked inside the Bonneville, and saw a canvas bag filled with a "tremendous amount of money," along with at least one gun, and a significant amount of blood on the driver's seat.

At trial in this case, O'Neill positively identified Bolduc, who was sitting in the courtroom. O'Neill's testimony was fully credible.

### G. Officer Timothy Leeman

Officer Leeman, who testified in this Court, likely would have given the following testimony at a trial of Bolduc and Larkin: On November 1, 1989, Leeman was riding in a police cruiser with Officer O'Neill on Route 495 north. As they took the off-ramp to Route 110, Leeman saw a vehicle coming up the parallel on-ramp onto Route 495. The vehicle had a flashing blue light on the dashboard, and a barrel of a gun was sticking out of the window of the vehicle.

O'Neill and Leeman followed the vehicle—and the Chelmsford police—to an area near the Woburn Street exit off of Route 495. With O'Neill, Leeman followed an individual—whom he later identified as Bolduc—through the neighborhood. At one point, Bolduc turned back toward O'Neill and Leeman, and fired a shot.

Leeman and O'Neill followed Bolduc to a house. O'Neill and Leeman took opposite paths around the house. Leeman heard a shot from the other side of the house. He backed away from the house, and heard O'Neill telling him not to go any further. Leeman waited, and saw Bolduc run past him. Leeman followed on foot.

Leeman followed Bolduc to a pickup truck, where Bolduc was pointing a gun in the window, telling the driver to drive away. Leeman watched as O'Neill approached Bolduc at the truck, and saw Bolduc point his gun at O'Neill. Leeman assisted O'Neill in apprehending Bolduc and escorting him to a Chelmsford cruiser.

At trial in this case, Leeman positively identified Bolduc, who was sitting in the courtroom. Leeman's testimony was fully credible.

### H. Officer Ron Gamache

Officer Ron Gamache likely would have given the following testimony: On Novem-

ber 1, 1989, Gamache heard a report that Officer Redican was in pursuit of a vehicle, and that shots had been fired. Gamache eventually reached the scene at Woburn Street in Lowell.

When he arrived, he saw Officer Redican pointing in his direction. Gamache saw a man carrying a semi-automatic weapon. Gamache drew his weapon. The man carrying the semi-automatic yelled "he's over there." Gamache looked up the street, and saw a man—whom he later identified as Bolduc—standing next to a house. Gamache exited his vehicle and told Bolduc to freeze. Bolduc ran around the side of the house.

Gamache followed Bolduc to Lowell Street, where he was joined in pursuit by Officers O'Neill and Leeman. Gamache saw Bolduc on Woburn Street, attempting to jump into the rear of a passing pickup truck. At this time a car pulled up next to Gamache, and O'Neill exited the car. O'Neill and Gamache ran to the pickup truck. O'Neill knocked Bolduc to the ground, at which point Gamache grabbed Bolduc's arms. O'Neill then disarmed Bolduc. Gamache trained his weapon on Bolduc while O'Neill handcuffed him. The officers then took Bolduc over to a Chelmsford cruiser.

### III. What If?

This case turns on several "what if" questions. First, if the plaintiffs had been given the Craft and Craig 302 reports before their trial in Wisconsin, would they likely have been acquitted on the Southgate charges? The Court finds they would have been acquitted of the Southgate crimes. If Bolduc and Larkin had been given the 302 reports, they would have been able to impeach effectively three of the four witnesses that testified against them: Dams, Wesolowski, and Radkte/Wiseman. Plaintiffs could have

not only highlighted these witnesses' identification of other individuals from the November 1988 photo array, but also noted Dams's and Radtke's misstatements that they had not seen such a photo array. (The fact that the Assistant United States Attorneys did not correct these misstatements buttresses the Court's conclusion that the 302 reports were not in the case file when it was made available to the prosecutors.) With these witnesses' testimony undermined, with Reister failing to identify either Bolduc or Larkin despite the fact that he got a good look at both of the culprits, with no physical evidence, and with alibi testimony, the government likely would not have established beyond a reasonable doubt the culpability of Bolduc and Larkin as to Southgate.

Second, if Bolduc and Larkin had been given the 302 reports, would they likely have been acquitted on the Oklahoma Avenue charges? The missing 302 reports regarding the Southgate witnesses were not directly relevant to the Oklahoma Avenue prosecution. Nonetheless, plaintiffs argue that had the 302 reports been introduced at trial, the reports would not only have sown juror doubts as to Southgate, but also would have infected the jurors' perception of the prosecution's case on Oklahoma Avenue.

But on this record, the Court cannot say that the Southgate 302 reports likely would have resulted in an acquittal on Oklahoma Avenue. Seven witnesses from Oklahoma Avenue identified either Bolduc or Larkin. As the Seventh Circuit noted in *Larkin*, "A number of witnesses identified Bolduc and Larkin as the perpetrators of the armed robber[y], and the jury credited their testimony in the face of the defendants' alibis and counsels' challenges to the reliability thereof." 978 F.2d at 971–72. The Court finds that plaintiffs have failed to meet their burden to show,

by a preponderance of evidence, that the Southgate reports would have changed the Oklahoma Avenue outcome.

Because plaintiffs have failed to meet their burden of showing a probable acquittal on the Oklahoma Avenue robbery, plaintiffs have failed to show that the FBI's failure to disclose the 302 reports caused plaintiffs harm. Judge Curran sentenced Bolduc to 520 months in prison, and Larkin to 330 months in prison, for their convictions on the two counts arising out the Oklahoma Avenue robbery. Plaintiffs have not argued that an acquittal on Southgate would have resulted in shorter sentences for the Oklahoma Avenue convictions. In other words, even with the Southgate 302 reports, Bolduc and Larkin would have been in jail until Kirkpatrick confessed to robbing the Wisconsin banks with his partner Bowman.

Assuming *arguendo* that the Southgate 302 reports would have resulted in an acquittal on the Oklahoma Avenue charges, the Court addresses another what-if question: If Bolduc and Larkin had been acquitted on all charges in Wisconsin, and returned home to face prosecution in the Chelmsford armored-car case, would Bolduc and/or Larkin likely have been convicted? Answering this question requires layering the standard of proof here (preponderance of evidence) over the standard of proof for a criminal conviction (beyond a reasonable doubt). Thus, the Court must ask whether it is likely that a jury would have found beyond a reasonable doubt that Bolduc and/or Larkin committed the crimes in Chelmsford and Lowell. The answer is a resounding yes.

The Court finds that it is likely that both Bolduc and Larkin would have been convicted beyond a reasonable doubt for the crimes in Chelmsford and Lowell, despite minor inconsistencies among the police reports, witness statements, and testimony.

Based on the credible live testimony of Officers O'Neill and Leeman, the Court finds that the testimony against Bolduc and Larkin would have been compelling. Bolduc's testimony in this Court concerning the Chelmsford incident—namely, that he just happened to stop at the scene of the car crash in Lowell, where he was wrongly apprehended by the police—was implausible, not credible, and perjurious. (Of course, at the criminal trial, he likely would have asserted the Fifth Amendment. Accordingly, I do not factor into my conclusions the facially implausible testimony of Bolduc.)

The crimes at issue were serious—including armed robbery and assault with intent to murder—and Bolduc, a career criminal, and Larkin likely would have received prison sentences that would have kept them in jail for at least as long as they spent in prison for their Wisconsin convictions. In the case of Bolduc, whose parole was actually revoked when he was arrested for the Chelmsford case (only to be reinstated later on the basis of the nolle prosequi), it is likely that his parole never would have been reinstated, and he would have resumed serving his life sentence for second-degree murder, followed by any sentence from the Chelmsford case. Ironically, Bolduc—and perhaps Larkin—actually *benefitted* from his wrongful prosecution for Wisconsin crimes, as he otherwise likely would still be in prison for the Chelmsford crimes.

In sum, even if the FBI had turned over the Southgate 302 reports prior to the trial of Bolduc and Larkin in Wisconsin, Bolduc and Larkin probably would have spent the same amount of time in prison, or more, either from their likely convictions for the Oklahoma Avenue robbery, or from their likely convictions for the Chelmsford armored-car robbery. Because actual harm is a necessary element of plaintiffs' negli-

gence claims, the Court orders entry of judgment for defendant United States. *See, e.g., Miller v. Wal–Mart Stores, Inc.,* 219 Wis.2d 250, 260, 580 N.W.2d 233, 238 (Wis.1998) (stating that in Wisconsin a negligence claim requires proof of "actual loss or damage").

### *ORDER*

The Court **ORDERS** judgment in favor of Defendant United States.