# United States Court of Appeals
## For the First Circuit

No. 03-2081

FRANK BOLDUC ET AL.,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya and Lynch, Circuit Judges.

Stephen Hrones, with whom Hrones, Garrity & Hedges was on brief, for appellants.
Anita Johnson, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, and George B. Henderson, II, Assistant United States Attorney, were on brief, for appellee.

March 23, 2005

**SELYA**, **Circuit Judge**. This case arises out of a series of apparent blunders on the part of the Federal Bureau of Investigation (FBI), leading to the wrongful conviction of two men on bank robbery charges. After the truth came to light, the trial court set aside the convictions. The men then sued the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680. Following a bench trial, the district court denied relief. See Bolduc v. United States, 265 F. Supp. 2d 153 (D. Mass. 2003). The court acknowledged the government's jurisdictional challenges but opted to decide the case on the merits. See id. at 154.

On appeal, we think it more orderly to treat the question of jurisdiction as a threshold matter. Concluding, as we do, that the FTCA does not support the assertion of federal subject matter jurisdiction, we affirm the judgment on that alternative ground.

## I. BACKGROUND

The chronicle of relevant events takes us back more than sixteen years. We recount the facts as supportably found by the district court. See id. at 155-69.

On June 28, 1988, two middle-aged white men attempted to rob a branch of the First Wisconsin Bank situated at the Southgate Mall in Greenfield, Wisconsin. The FBI mounted an investigation into the Southgate incident. Agent Daniel Craft led the probe. Because the thieves came away from Southgate empty-handed, Craft

-2-

considered the crime a "nothing robbery" and delegated substantial investigative responsibility to a rookie, Agent Derrel Craig.

On November 15, 1988, Craft and Craig rounded up four Southgate eyewitnesses and showed them a photographic array. The array did not include pictures of either the appellants or the men who ultimately were determined to be the actual culprits. Nevertheless, two of the four eyewitnesses selected the photographs of Allan Daniel Wilwerding and Douglas Wayne Thompson as depictions of the robbers, and another eyewitness fingered Wilwerding. The agents recorded the results in separate memos, known in FBI parlance as 302 reports. The two sets of reports attributed different levels of certitude to the eyewitness identifications: Craft's reports indicated that two of the eyewitnesses had described Wilwerding and Thompson as "similar" to the robbers whereas Craig's reports noted that those eyewitnesses had identified the men as "identical" to the robbers. The reports regarding the eyewitness who had identified only Wilwerding were also inconsistent; again, Craft's report attributed a "similar" identification to that eyewitness whereas Craig's report recorded an "identical" match.

As lead investigator, Craft bore responsibility for finalizing the 302 reports by reviewing them for errors and initialing them. According to FBI policy, once Craft finalized the 302 reports, he was required to place them in the case file. The

court below found that, in this instance, Craft ignored this policy and excluded Craig's 302 reports from the case file because he unilaterally decided that they inaccurately reported the strength of the identifications.  Id. at 157.  The court also found it doubtful that Craft's 302 reports were in the case file when the FBI turned it over to the United States Attorney.  Id.  It is undisputed that FBI agents have no discretion to withhold particular 302 reports from a case file.  See id.

On October 18, 1989, two middle-aged white men stuck up the Oklahoma Avenue branch of the First Wisconsin Bank in Milwaukee and absconded with $400,000.  Agent Craft again took the lead in the ensuing investigation.  This time, however, his aide-de-camp was Agent Margaret Cronin.  The general description of the Oklahoma Avenue perpetrators reminded Cronin, a Boston native, of an article she had read in a Boston newspaper describing arrests in Lowell, Massachusetts, following an armored car robbery in nearby Chelmsford.  Those arrested included two middle-aged white men, and Cronin thought that she perceived some similarities.

In early 1990, on Cronin's initiative, the Milwaukee office of the FBI included photographs of plaintiffs-appellants Frank Bolduc and Francis Larkin (each of whom had been detained in connection with the Chelmsford armored car robbery) in an array

displayed to the Southgate and Oklahoma Avenue eyewitnesses.[1] Some witnesses identified Bolduc and/or Larkin as the culprits; others were unable to make any positive identifications at that time. Encouraged to some extent by these results, the FBI arranged to have the appellants transported to Wisconsin and placed them in a lineup. Several (but not all) of the eyewitnesses to the Southgate and Oklahoma Avenue incidents identified them as the robbers. A federal grand jury, sitting in Milwaukee, subsequently indicted the appellants for the attempted armed robbery of Southgate and the armed robbery of Oklahoma Avenue, see 18 U.S.C. § 2113, and for related firearms offenses, see id. § 924(c)(1).

The trial went forward in February of 1991. The prosecution relied entirely upon eyewitness identifications, including the testimony of the same three witnesses who previously had identified others (Wilwerding and Thompson) as "similar" or "identical" to the Southgate bandits; this time, the trio made positive identifications of Bolduc and/or Larkin. Neither the prosecutor nor the witnesses themselves mentioned their earlier (inconsistent) match-ups. The defense relied mainly upon alibi testimony indicating that the appellants were in the Boston area when the crimes were committed. The jury found the appellants

---

[1]Larkin died while this suit was pending and the administrator of his estate has been substituted as a party plaintiff in his place and stead. See Fed. R. Civ. P. 25(a).

guilty of all charges and, on May 24, 1991, the district court sentenced both men to serve lengthy prison terms.[2]

Following the imposition of sentence, federal officials returned Bolduc to a Massachusetts state penitentiary to resume serving a life sentence for an earlier second-degree murder conviction, which the parole board had reinstated upon Bolduc's arrest for his putative involvement in the Chelmsford armored car robbery. Upon learning of the federal convictions, however, Massachusetts authorities decided to dismiss the charges pending against Bolduc and Larkin with respect to the armored car caper. In their view, the appellants' ages and the length of their federal sentences contradicted the need to seek additional prison time. Despite this decision, the Massachusetts parole board determined that Bolduc's federal conviction furnished sufficient grounds to support the revocation of his parole and, therefore, he remained in state prison.

Notwithstanding the appellants' arrests and incarceration, similar robberies continued to plague Midwestern banks. More than six years after the appellants were sentenced,

---

[2]The court sentenced Bolduc to 280 months for the attempted robbery at Southgate (count 1), 60 months for a related firearms charge (count 2), 280 months for the Oklahoma Avenue robbery (count 3), and 240 months for a related firearms charge (count 4). The sentences on counts 1 and 3 were to run concurrently, followed by the sentence for count 2 and, finally, the sentence for count 4. The court sentenced Larkin to concurrent terms for counts 1 and 3 (each 90 months), followed by a consecutive 60-month term for count 2 and a further consecutive 240-month term for count 4.

the FBI arrested William Kirkpatrick on suspicion of involvement in several of the more recent robberies. Though incarcerated, Bolduc caught wind of this turn of events and asked Kirkpatrick's attorney for any available information about the Southgate and Oklahoma Avenue robberies. The lawyer sent Bolduc a packet containing, inter alia, Agent Craig's 302 reports anent the November 1988 photo array. It was in that roundabout way that Bolduc first learned of this exculpatory evidence. Larkin learned of the evidence at an even later date.

In time, Kirkpatrick confessed that he and a partner had undertaken both the Southgate and Oklahoma Avenue heists. The appellants filed federal habeas petitions, see 28 U.S.C. § 2255, which the government did not oppose. On June 11, 1999, a federal district judge granted the petitions, vacated the appellants' sentences, and issued certificates of innocence. Larkin was released from federal custody and Bolduc, relying on the certificate of innocence, successfully petitioned the Massachusetts parole board for reinstatement of his parole.

## II. TRAVEL OF THE CASE

Following their release, the appellants commenced a civil action in the United States District Court for the District of Massachusetts in an effort to recover money damages for the eight years that they had languished in prison. Their complaint presented claims under the FTCA against the United States for

malicious prosecution, false imprisonment, abuse of process, and negligent supervision, as well as a <u>Bivens</u> claim against Agent Craft, <u>see</u> <u>Bivens</u> v. <u>Six Unknown Named Agents of FBN</u>, 403 U.S. 388, 389 (1971). The district court dismissed the malicious prosecution, abuse of process, and false imprisonment counts for failure to state claims upon which relief could be granted, <u>see</u> Fed. R. Civ. P. 12(b)(6), and dismissed the <u>Bivens</u> claim for want of in personam jurisdiction, <u>see</u> Fed. R. Civ. P. 12(b)(2). None of these rulings have been contested on appeal and we abjure any further discussion of them.[3] Withal, the district court permitted the negligent supervision claim to go forward and subsequently allowed the appellants to add a straight negligence claim under the FTCA. Both claims were premised on the allegation that the FBI's withholding of the above-described 302 reports deprived the appellants of the benefit of exculpatory evidence before and during the criminal trial, and thus led to their wrongful convictions.

The parties engaged in extensive discovery. The government challenged the existence of subject matter jurisdiction for the first time in a motion served almost two months after the deadline for filing dispositive motions had passed. Subject matter jurisdiction is not waivable, and a party cannot confer subject

---

[3]On October 21, 2002, the lower court granted the appellants' motion to transfer the claim against Craft to the United States District Court for the Eastern District of Wisconsin. The docket of that court does not indicate that the appellants ever perfected the transfer.

matter jurisdiction upon a federal court by failing to assert that defense in a timely manner. See Quinn v. City of Boston, 325 F.3d 18, 26 (1st Cir. 2003); Irving v. United States, 162 F.3d 154, 160 (1st Cir. 1998) (en banc). Still, the belated filing of a motion to dismiss for want of subject matter jurisdiction can have consequences in terms of a court's case-management decisions. So it was here: the district court elected to withhold consideration of the jurisdictional issue until after the trial.

The appellants' two remaining claims — negligence and negligent supervision under the FTCA — were tried to the district court for four days. The court then requested post-trial briefing. The government's memorandum raised a litany of defenses, including a renewed plea that the court lacked subject matter jurisdiction.

On July 2, 2003, the district court filed a lengthy rescript in which it ordered judgment in favor of the United States on the ground that the appellants had not proved that the FBI's failure to provide the exculpatory 302 reports had harmed them. See Bolduc, 265 F. Supp. 2d at 154, 171. The court's rationale is complicated, see id. at 154, 169-71, and the appellants bitterly dispute it. We need not set foot on that battlefield: federal courts are courts of limited jurisdiction and, in the circumstances of this case, we consider ourselves bound to address the jurisdictional issue first, regardless of the government's failure

to raise it in a more timely fashion.[4]  See Irving, 162 F.3d at 160 (admonishing that the federal courts "have an affirmative obligation to examine jurisdictional concerns on their own initiative" even if the parties have neglected them); Berner v. Delahanty, 129 F.3d 20, 23 (1st Cir. 1997) (noting "that a court should first confirm the existence of rudiments such as jurisdiction . . . before tackling the merits of a controverted case").  As matters turn out, resolution of that issue terminates this appeal.

## III.  SUBJECT MATTER JURISDICTION

Consistent with the foregoing, we turn directly to the jurisdictional issue.  We begin with first principles:  it is apodictic that "[a]s a sovereign nation, the United States is immune from liability except to the extent that it consents to suit."  Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 39 (1st Cir. 2000).  The FTCA evinces a waiver of sovereign immunity with respect to certain categories of torts committed by

---

[4]We recognize that, in some circumstances, a court may avoid a jurisdictional quandary if a tidier resolution on the merits will dispose of the case in favor of the party challenging jurisdiction. See, e.g., United States v. Stoller, 78 F.3d 710, 715 (1st Cir. 1996).  That is a narrow exception, however, especially in view of a federal court's "special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.'"  Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) (quoting Mitchell v. Maurer, 293 U.S. 237, 244 (1934)); accord Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).  In this case, we deem it prudent to hew to the general rule rather than the long-odds exception to it.

federal employees in the scope of their employment. See 28 U.S.C. § 1346(b)(1). It simultaneously grants the federal district courts jurisdiction over such claims. See id.; see also FDIC v. Meyer, 510 U.S. 471, 475-77 (1994). Thus, we must determine whether this waiver of sovereign immunity extends to the appellants' claims of negligence and negligent supervision, so that those claims fall within the jurisdictional grant of section 1346(b)(1). See Meyer, 510 U.S. at 477.

> That grant extends to claims
>
> against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). A further explication of the last clause is to be found in 28 U.S.C. § 2674, which provides that the United States only "shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances." A bundle of exceptions, mostly in the nature of exclusions and carve-outs, circumscribes the FTCA's waiver of sovereign immunity. See

28 U.S.C. § 2680(a)-(n); see also Dynamic Image Techs., 221 F.3d at 39.[5]

We add a caveat. As with all waivers of sovereign immunity, the FTCA must be "construed strictly in favor of the federal government, and must not be enlarged beyond such boundaries as its language plainly requires." United States v. Horn, 29 F.3d 754, 762 (1st Cir. 1994). With this principle firmly in mind, we undertake our jurisdictional analysis.

As said, the appellants prosecuted two FTCA claims: one for negligence (based on Agent Craft's alleged failure to include the above-described 302s in the case file turned over to federal prosecutors and ultimately to the defense) and one for negligent supervision (based on the alleged failure of Craft's superiors to

_____

[5]Only two of these exceptions are relevant to this case. They state in pertinent part that the provisions of the FTCA shall not apply to:

(a) Any claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency . . . .

\*          \*          \*

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights [subject to certain provisos] . . . .

28 U.S.C. § 2680(a), (h).

-12-

oversee him more closely).  We consider the jurisdictional bona fides of each claim separately.

### A.   **The Negligence Claim**.

The "law of the place" provides the substantive rules to be used in deciding FTCA actions.  28 U.S.C. § 1346(b)(1).  The phrase "law of the place" refers to the law of the state in which the allegedly tortious acts or omissions occurred. See Meyer, 510 U.S. at 478; Castro v. United States, 775 F.2d 399, 405 (1st Cir. 1985) (per curiam).  Federal constitutional or statutory law cannot function as the source of FTCA liability.  See Meyer, 510 U.S. at 478 (holding that "the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims"); Sea Air Shuttle Corp. v. United States, 112 F.3d 532, 536-37 (1st Cir. 1997) (explaining that there can be no FTCA jurisdiction where the challenged government conduct has no parallel in the private sector and the asserted liability arises from a federal statutory or regulatory obligation with no comparable common law principle under which private persons would be held liable); Zabala Clemente v. United States, 567 F.2d 1140, 1149 (1st Cir. 1978) (establishing that "even where specific behavior of federal employees is required by federal statute, liability to the beneficiaries of that statute may not be founded on the Federal Tort Claims Act if state law recognizes no comparable private liability").  It follows that the appellants cannot premise jurisdiction on the rule of Brady v.

-13-

<u>Maryland</u>, 373 U.S. 83 (1963),[6] but, rather, must look to Wisconsin law and must identify in that body of jurisprudence a basis for holding a private person liable in tort for acts and omissions comparable to those committed (or, at least, allegedly committed) by Agent Craft. See <u>Davric Me. Corp.</u> v. <u>U.S. Postal Serv.</u>, 238 F.3d 58, 64 (1st Cir. 2001).

To maintain a cause of action for negligence in Wisconsin, a plaintiff must show "(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." <u>Rockweit</u> v. <u>Senecal</u>, 541 N.W.2d 742, 747 (Wis. 1995). Building on this fairly conventional formulation, the appellants argue that Agent Craft's failure to ensure the turnover of exculpatory evidence constituted a breach of a duty cognizable under Wisconsin tort law.

To satisfy the duty prong, the appellants rely in part on the duty of state government (and, particularly, state prosecutors) to disclose exculpatory evidence. See, e.g., Appellants' Reply Br. at 5-6 (citing Wis. Stat. § 971.23(1)). This effort is unconvincing. By the FTCA's plain terms, a waiver of sovereign immunity attaches only where "a <u>private</u> <u>person</u>[] would be held liable." 28 U.S.C. § 1346(b)(1) (emphasis supplied). The

---

[6]Broadly stated, <u>Brady</u> imposes a constitutional duty on prosecutors to turn over exculpatory evidence to a defendant in a criminal case. See <u>Brady</u>, 373 U.S. at 87.

appellants have not pointed to any instance in which Wisconsin has imposed private liability on a prosecutor or other state agent for a failure to disclose exculpatory evidence. That is a fatal flaw, for the federal government does not yield its immunity with respect to obligations that are peculiar to governments or official-capacity state actors and which have no private counterpart in state law. See Franco de Jerez v. Burgos, 947 F.2d 527, 528 (1st Cir. 1991) (speaking in terms of the negligence of government employees as such is insufficient to satisfy the FTCA's "private person" requirement); DiMella v. Gray Lines of Boston, Inc., 836 F.2d 718, 720 (1st Cir. 1988) (stating that "[w]hatever liability [a state] may have chosen to assume for itself as a matter of governmental policy has no bearing on the liability of . . . private persons, the standard the federal government has accepted"). Because Wisconsin's recognition of a governmental duty to disclose exculpatory evidence does not ground private liability under that state's law, it cannot serve as a hook on which to hang federal jurisdiction here.

This conclusion does not end our inquiry. We nonetheless must inquire whether there is any way in which Wisconsin might impose tort liability upon a private party under circumstances sufficiently similar to those present in this case, that is, a person who comes into possession of exculpatory evidence as part of an official investigation and carelessly fails to disclose that

-15-

evidence to prosecutors (and, ultimately, to the accused). This means, in effect, that we must look for "some relationship between the governmental employee[s] and plaintiff to which state law would attach a duty of care in purely private circumstances." Sea Air Shuttle, 112 F.3d at 537 (citation and internal quotation marks omitted).

In formulating its test for negligence, Wisconsin has adopted a broad definition of the element of duty. See A. E. Inv. Corp. v. Link Builders, Inc., 214 N.W.2d 764, 766 (Wis. 1974) (explaining that Wisconsin has embraced a rationale that recognizes a duty wherever harm is foreseeable). As a result of this choice, Wisconsin courts, rather than examining the relationship between the parties to determine the existence vel non of a duty, focus on the foreseeability of harm in order to ascertain whether a duty arises. This means that "[t]he duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act." Id.

This formulation casts a wide net. Indeed, the Wisconsin Supreme Court — the most authoritative arbiter of Wisconsin law — has ruminated that "[i]n Wisconsin, everyone has a duty of care to the whole world." Miller v. Wal-Mart Stores, Inc., 580 N.W.2d 233, 238 (Wis. 1998). In these general terms, then, a private person

-16-

might be said to owe a duty to a person suspected of crime — the duty being to exercise due care in the handling of exculpatory evidence so as to prevent the foreseeable harm of wrongful conviction. Cf. Bowen v. Lumbermens Mut. Cas. Co., 517 N.W.2d 432, 439 (Wis. 1994) ("Wisconsin law considers conduct to be negligent if it involves a foreseeable risk of harm to anyone.").

Even if we assume the existence of such a duty, that assumption does not take the appellants as far as they need to go. Under the FTCA, the relevant inquiry is not whether state law might assign a duty to a private person in the same or similar circumstances, but, rather, whether state law would impose liability on a private person in the same or similar circumstances. See 28 U.S.C. §§ 1346(b)(1), 2674. The stating of a claim for negligence (the failure to exercise due care by one having a general duty to do so in the face of foreseeable harm) does not automatically mean that liability would attach under Wisconsin law. The contrary is true: "[i]n Wisconsin, the doctrine of public policy, not the doctrine of duty, limits the scope of a defendant's liability." Bowen, 517 N.W.2d at 439; see also Rockweit, 541 N.W.2d at 750 (stating that "the determination to deny liability is essentially one of public policy rather than of duty or causation"); Schuster v. Altenberg, 424 N.W.2d 159, 164 (Wis. 1988) ("[O]nce it is determined that a negligent act has been committed and that the act is a substantial factor in causing the harm, the

-17-

question of duty is irrelevant and a finding of nonliability can be made only in terms of public policy."). Because the measure for determining the federal government's consent to suit under the FTCA is a private person's potential <u>liability</u> under state law, we turn to Wisconsin's doctrine of public policy.

The question of whether public policy precludes tort liability is "a question of law solely for judicial decision." <u>Morgan</u> v. <u>Pa. Gen. Ins. Co.</u>, 275 N.W.2d 660, 667 (Wis. 1979). The Wisconsin Supreme Court has enumerated six factors relevant to this determination. <u>See</u> <u>Miller</u>, 580 N.W.2d at 240. We need not call the roll, however, as that court has decided a case directly on point dealing with a private person in markedly similar circumstances. We look to that decision for guidance.

In <u>Bromund</u> v. <u>Holt</u>, 129 N.W.2d 149 (Wis. 1964), the plaintiff brought an action in negligence against a doctor, in his private capacity, for careless performance of an autopsy commissioned by law enforcement officers in the course of their investigation into the death of the plaintiff's wife. <u>Id.</u> at 150-51. The plaintiff asserted that the doctor's negligent performance of the autopsy and subsequent proffer of a flawed cause-of-death opinion led directly to the plaintiff's arrest, prosecution, and resulting damages. <u>See</u> <u>id.</u> at 150. The court framed the question presented by the plaintiff's suit as whether, assuming that negligence and causation were present, the plaintiff's interest in

-18-

"freedom from unjustifiable criminal litigation" is the "type of interest [that] is protected against unintentional invasion." Id. at 151.

The court then undertook a public policy analysis to determine whether imposing liability on the doctor would be appropriate. It began by noting that "[t]he law, for reasons of policy, closely circumscribes the types of causes of action which may arise against those who participate in law enforcement activity or in the functioning of the judicial system." Id. at 152. It went on to observe that, in civil litigation, such defendants often have a relationship to the judicial process that affords them immunity from private liability. See id. (citing the protections afforded to, inter alios, prosecutors and witnesses). It next determined that, even when a defendant's relationship to the judicial process does not afford a specific immunity, "he is still not held liable to the person who has been subjected to unjustifiable prosecution in the absence of malice." Id. at 153.

The court's reasoning is instructive. In its view, law enforcement and the safeguarding of society from crime would suffer if government agents (and outsiders hired to assist in law enforcement activities) were subject to private liability for damages arising from simple negligence in the performance of their duties. See id. at 153-54. The Bromund court held that:

> even if a person employed by the public to
> assist in law enforcement . . . does not enjoy

> immunity, . . . the same considerations of
> public policy which require proof of malice as
> an element of an action for malicious
> prosecution or defamation under these
> circumstances must exclude liability founded
> upon mere negligence. In our opinion, the
> interest in freedom from unjustifiable
> criminal litigation is, as a matter of policy,
> not protected from unintentional tort.

Id. at 154.

This holding has particular pertinence for present purposes. Assuming arguendo that the appellants could demonstrate negligence, causation, and actual harm — a matter on which we take no view — Wisconsin law nonetheless would preclude the imposition of private liability on a private person in circumstances similar to those of Agent Craft.[7] Under Bromund, malice is a prerequisite for imposing private tort liability upon a private individual working with law enforcement when the performance of his duties has resulted in an unjustifiable criminal prosecution and/or conviction. See id. at 153-54. Because the appellants have failed to offer a scintilla of proof of malice, they have failed to establish a basis under the law of the place for imposing liability upon a private person in like circumstances. Consequently, we hold

---

[7]A party can, of course, maintain actions for malicious prosecution or abuse of process under Wisconsin law. The appellants asserted such claims here. The district court dismissed the malicious prosecution claim for failure to plead the necessary element of malice and the abuse of process claim for failure to assert that the withholding of the 302s was willful or done with an ulterior purpose. Bolduc v. United States, No. 01-CV-11376, 2002 WL 1760882, at *3-*4 (D. Mass. July 30, 2002). The appellants have not challenged either of those rulings on appeal.

that the FTCA does not waive the federal government's sovereign immunity vis-à-vis the appellants' negligence claim.  It follows inexorably that there is no federal subject matter jurisdiction over that component of the case.

### B.  <u>The Negligent Supervision Claim</u>.

This leaves the negligent supervision claim.  Wisconsin recognizes the tort of negligent supervision.  <u>Miller</u>, 580 N.W.2d at 241.  Under Wisconsin law, a breach of the general duty to supervise is actionable if two causation components exist:  first, the wrongful act of an employee must have been a cause-in-fact of the plaintiff's injury; second, the employer's negligence must have been a cause-in-fact of the employee's wrongful act.  <u>Id.</u> at 239. For these purposes, it is not necessary that the employee's wrongful act, in and of itself, constitute an actionable tort.  <u>Id.</u> Hence, our conclusion that the United States cannot be held vicariously liable for Agent Craft's negligence in the handling of exculpatory evidence, <u>see</u> <u>supra</u> Part III(A), does not negate the possibility that the United States might be held directly liable for negligent supervision.

We need not hazard a public policy analysis to determine whether a private employer in like circumstances would face liability for negligent supervision under Wisconsin law.  Even if the appellants could successfully urge the affirmative of that proposition — a matter on which we do not opine — the discretionary

-21-

function exception to the FTCA, 28 U.S.C. § 2680(a), would divest the federal courts of jurisdiction over this claim. We explain briefly.

The FTCA insulates the United States from "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Id. This proviso balances "Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. Varig Airlines, 467 U.S. 797, 808 (1984). When a claim falls within the contours of section 2680(a), it must be dismissed for lack of subject matter jurisdiction. See Kelly v. United States, 924 F.2d 355, 360 (1st Cir. 1991).

To determine whether the discretionary function proviso applies, an inquiring court must first identify the government conduct giving rise to the claim in question. Muniz-Rivera v. United States, 326 F.3d 8, 15 (1st Cir. 2003). In assaying that conduct, the court must examine its nature (as opposed to the status of the government actor), Berkovitz v. United States, 486 U.S. 531, 536 (1988), engaging in a binary analysis to ascertain whether Congress sought to shelter that kind of conduct from tort liability, Muniz-Rivera, 326 F.3d at 15.

-22-

The first part of that analysis asks whether the conduct itself is discretionary, that is, "a matter of choice for the acting employee." Berkovitz, 486 U.S. at 536. This definition excludes actions prescribed by federal statute, regulation, or policy. Id. If the court concludes that the conduct is not a product of discretion, the analysis ends and the discretionary function proviso drops out of the case. See Kelly, 924 F.2d at 360 (noting that a court will proceed to the second furcula of the discretionary function test only if it concludes that the relevant conduct is discretionary). If, however, the court concludes that the conduct is a product of discretion, it then must determine whether the exercise of that discretion is susceptible to policy-related judgments. See Berkovitz, 486 U.S. at 537.

Decisions are thought to be susceptible to policy-related judgments if they involve an "unrestrained balancing of incommensurable values," including a differential allocation of resources among various political objectives. See Shansky v. United States, 164 F.3d 688, 695 (1st Cir. 1999). On this issue, it is the plaintiff who must carry the devoir of persuasion. See id. at 692 (explaining that the law presumes that the exercise of discretion implicates policy and that it is the plaintiff's burden to demonstrate that the decision is not susceptible to policy-related judgments). Only if the conduct is both discretionary and policy-driven will section 2680(a) strip the court of subject

-23-

matter jurisdiction.  See Muniz-Rivera, 326 F.3d at 15; Attallah v. United States, 955 F.2d 776, 783 (1st Cir. 1992).

Against this backdrop, the appellants argue that the FBI had an obligation under federal law to disclose exculpatory evidence to them and, therefore, that the conduct relevant to their claim was not discretionary.  This argument confuses the ministerial duty of FBI agents to place all 302 reports in the case file with the responsibility of FBI supervisors to oversee the work of the agents under their command.  It is the latter activity that gives rise to the negligent supervision claim.  On this issue, it is irrelevant whether Agent Craft had discretion to determine whether particular 302 reports should be left out of the case file.  See Attallah, 955 F.2d at 783 (explaining that the judicial inquiry must focus "on the permissible range of action available to the government employee allegedly at fault").

Having identified the relevant activity — the FBI's oversight of Agent Craft's handling of the 302s — we next must consider whether that activity is discretionary and susceptible to policy-related judgments.  The appellants assign fault at a general level to the quality of the supervision.  At trial, they adduced evidence that Agent Craft sometimes initialed 302 reports and other documents without reviewing them thoroughly (even though his supervisors had advised him to be more fastidious in performing that task) and that one supervisor had written a performance

-24-

appraisal suggesting that Craft had room for improvement in this area. The appellants have not shown, however, that Craft's supervisors were constrained by any law, regulation, or policy to respond in a particular way upon learning that an agent was not proficient at a particular task. By the same token, they have not adverted to any federal statute, regulation, or policy that dictates a specific regime of oversight that FBI hierarchs must practice to ensure that agents handle exculpatory evidence properly. Where no specific action is required within a category of conduct and the government actors in question have latitude to make decisions and choose among alternative courses of action, the conduct is discretionary. See Irving, 162 F.3d at 163-64. In this instance, there is ample room for choice in the agency's supervision of its work force.

If more were needed — and we doubt that it is — this court has recognized, in the context of supervision, that in the absence of a statutory or regulatory regime that sets out particulars as to how an agency must fulfill its mandate, the development and management of a supervisory model is a matter of agency discretion. Attallah illustrates the point. There, we held that supervisory decisions of the Customs Service concerning the oversight of customs agents were discretionary in nature. See Attallah, 955 F.2d at 784-85.

The appellants argue that, notwithstanding this precedent, the supervisory decision here is beyond the domain of discretion. They assert that even if a claim for negligent supervision would generally be barred, the bar should not apply here because it is unlawful for a member of the prosecution team to withhold exculpatory evidence and it cannot be within an official's discretion to permit unlawful behavior. To bolster this construct, they cite Tonelli v. United States, 60 F.3d 492 (8th Cir. 1995), for the proposition that "[f]ailure to act after notice of illegal action does not represent a choice based on plausible policy considerations." Id. at 496.

Tonelli is easily distinguishable. The court there recognized that "[i]ssues of employee supervision . . . generally involve the permissible exercise of policy judgment and fall within the discretionary function exception," id., but left open the possibility that an employer who had notice of ongoing illegal activity would not be entitled to claim that a failure to act was within the scope of discretion, see id. It therefore determined that summary judgment would be inappropriate because a factual dispute persisted over whether the employer had notice of the illegal actions of its employees. Id. In this case, unlike in Tonelli, we have the benefit of a full trial record, and we find nothing to support the premise that FBI supervisors in the Milwaukee office had notice of any illegal employee activity. As

a result, we need not decide whether that situation would be subject to the conclusions that we otherwise reach.

That ends this aspect of the matter. In _Attallah_, we commented that supervision over customs agents "certainly involves a degree of discretion . . . of the kind that Congress sought to protect through the discretionary function exception." 955 F.2d at 784. We think that comment is fully applicable here. Accordingly, we hold that the FBI's supervision of Craft's job performance was discretionary in nature.

We come, then, to the question of whether this discretionary conduct was grounded in policy. On that issue, the government benefits from the presumption that a supervisor's discretionary acts are grounded in policy. See _United States_ v. _Gaubert_, 499 U.S. 315, 324 (1991); _Muniz-Rivera_, 326 F.3d at 17. It is the plaintiff's burden to rebut this presumption and demonstrate that particular discretionary conduct is not susceptible to policy-related judgments. See _Shansky_, 164 F.3d at 692. In this instance, the appellants have wholly failed to carry that burden. We conclude, therefore, that the FBI's supervisory decisions were a matter of agency discretion and involved policy judgments of a kind that the discretionary function proviso was intended to shield. See _Attallah_, 955 F.2d at 784.

To say more on this point would be to paint the lily. Based on the foregoing, we hold that the discretionary function

proviso, 28 U.S.C. § 2680(a), divests the federal courts of jurisdiction over the appellants' claim of negligent supervision.[8]

## IV. CONCLUSION

This is a sad case. It shows that even the nation's premier law enforcement agency sometimes bungles. But Congress has never enacted a wholesale waiver of the federal government's sovereign immunity from suit, so it is unsurprising that the FTCA does not cover every error by a federal agent. Neither of the two claims at issue here — one for negligence and the other for negligent supervision — comes within the carapace of the carefully limited waiver of federal sovereign immunity that the FTCA denotes.

We need go no further. We hold that the district court lacked subject matter jurisdiction to hear the appellants' claims. On this ground, we affirm the entry of judgment in favor of the United States.

**Affirmed**.

---

[8]For consistency's sake, we affirm the entry of judgment in favor of the United States with respect to this claim on an available jurisdictional ground. We note, however, that we have scoured the record and have found no support for the contention that any negligence on the part of FBI supervisors was a cause-in-fact of Agent Craft's failure to place the 302s in the case file.