# United States Court of Appeals
## For the First Circuit

No. 12-2466

MICHAEL MAHON,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

Alan S. Zwiebel, with whom Jonathan Fairbanks and Zwiebel &
Fairbanks, L.L.P. were on brief, for appellant.
Christine J. Wichers, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

February 7, 2014

**THOMPSON, <u>Circuit Judge</u>**.

**Setting the Stage**

Today's case takes us to the Charlestown Navy Yard in Charlestown, Massachusetts. Established in 1800, the Yard is now a national historic site where one can see the USS CONSTITUTION (the 216-year-old frigate famously nicknamed "Old Ironsides") and the Commandant's House (a 19th-century mansion built for the Yard's first commandant), among other celebrated attractions. Overseeing the Yard is the Boston Historical Park Service, a unit of the Interior Department's National Park Service ("Boston Park" and the "Service," for short). Anyone can rent the Commandant's House for weddings and such, thanks in part to Boston Park's contracting with Eastern National to manage the House and Eastern National's contracting with Amelia Occasions to handle the events. Rental fees are not exactly cheap, running in the $3,500 neighborhood. And under the agreements, Amelia Occasions gets to keep 80% of any fee, while Boston Park and Eastern National get to split the rest.

An altogether tragic event at the Yard triggered a lawsuit that is the focus of this appeal. Attending a wedding reception at the Commandant's House, Michael Mahon fell from a second-story portico. His resulting injuries left him a quadriplegic. Convinced that he had fallen because of the portico's (supposedly) dangerously-low railings, Mahon sued the government on this theory, relying on the Federal Tort Claims Act

("FTCA," to save some keystrokes).  See 28 U.S.C. §§ 1346(b), 2671-2680.

For those unacquainted with the mysteries of the FTCA, this statute waives the government's sovereign immunity for certain torts committed by its employees in the scope of their employment. See id. § 1346(b).  Of course there are exceptions.  See id. § 2680.  And if one applies, the government gets its immunity back, meaning it need not answer the claim in court because (to use a little legalese) there is no subject-matter jurisdiction.  See, e.g., Muniz-Rivera v. United States, 326 F.3d 8, 12 (1st Cir. 2003).  The exception most relevant here bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused."  See 28 U.S.C. § 2680(a).  This is what is called (commonsensically enough) the discretionary-function exception.  See, e.g., Muniz-Rivera, 326 F.3d at 14-15.

Invoking that exception, the government moved early on to dismiss Mahon's case for lack of subject-matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  Mahon then amended his complaint, see Fed. R. Civ. P. 15(a)(1)(b), adding claims against Eastern National and Amelia Occasions.  The government reasserted its motion.  And Mahon in turn opposed — but to no avail, as the district judge granted the government's dismissal request.

Believing the judge got it wrong, Mahon moved for reconsideration, see Fed. R. Civ. P. 59(e), 60(b), arguing that the agreements involving Boston Park, Eastern National, and Amelia Occasions were "concession contracts."[1]  And, he added, the Service's policy manual (entitled "Management Policies") declares in section 10.2.4.8 that concession contracts require concessioners to prepare risk-management programs that jibe with the Occupational Safety and Health Act of 1970 ("OSHA," from now on) — programs that the park "superintendent" has to approve.[2]  All of this meant, according to Mahon, that Eastern National and Amelia Occasions had

---

[1] Broadly speaking, a "concession contract" is "a binding written agreement between the Director [of the Service] and a concessioner . . . that authorizes the concessioner to provide certain visitor services within a park area under specified terms and conditions."  36 C.F.R. § 51.3.  But these services are "limited to those . . . that are necessary and appropriate for public use and enjoyment of the unit of the National Park System in which they are located."  16 U.S.C. § 5951.

[2] That section reads:

Concession contracts require each concessioner to develop a risk management program that is (1) appropriate in scope to the size and nature of the operation, (2) in accord with [OSHA] and the [Service] concession risk management program, and (3) approved by the superintendent.  Concessioners are responsible for managing all of their operations to minimize risk and control loss due to accident, illness or injury.  To ensure compliance, the Service will include a risk management evaluation as part of its standard operation review of concession operations.

Both sides rely on the 2006 edition of the policy manual, and we will follow their lead in assuming that this version controls.  See Shansky v. United States, 164 F.3d 688, 691 n.3 (1st Cir. 1999) (taking that tack in a similar situation).

to conduct risk-management assessments. Neither did, he said. But had they done so, he added, Boston Park would have learned about the portico's "impermissibly low railing," giving it a nondiscretionary duty to fix the problem and thus placing his case beyond the discretionary-function exception's reach. The judge granted Mahon's motion, vacating the dismissal and letting discovery go forward on the issue of whether "the defendants' relationship was governed by a so-called 'concession contract'" (which is how the judge characterized his ruling).

After some discovery, the government again moved to dismiss for lack of subject-matter jurisdiction. And the judge obliged, concluding among other things that even if the contracts had been concession contracts, and even if Eastern National and Amelia Occasions had created risk-management plans that dealt with any railing problems, the government still had discretion to reject the plan's recommendations — which, he ruled, brings Mahon's case within the ambit of the discretionary-function exception.

This appeal followed.[3] We now give fresh review to the judge's dismissal order, taking as true all well-pled facts and looking beyond the pleadings (to affidavits, depositions, exhibits,

---

[3] For anyone wondering about Eastern National and Amelia Occasions: By stipulation, Mahon voluntarily dismissed his claims against Eastern National with prejudice. <u>See</u> Fed. R. Civ. P. 41. His case against Amelia Occasions went to trial, however, and the jury returned a verdict in Amelia Occasions' favor. And as our case caption indicates, neither Eastern National nor Amelia Occasions is a party to this appeal.

etc.) where necessary.  See, e.g., Carroll v. United States, 661 F.3d 87, 94-95 (1st Cir. 2011); Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010).  And as we forge on, we keep two other things in mind:  first, Mahon has the burden of proving sovereign immunity has been waived, see Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003), and second, courts must construe the FTCA's sovereign-immunity waiver strictly in the government's favor, see Bolduc v. United States, 402 F.3d 50, 56 (1st Cir. 2005); see also Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 39 (1st Cir. 2000) (explaining that "this general waiver is far from an open-ended panacea for would-be claimants").

## Analyzing the Issues

The parties — who agree on very little — agree on the legal principles that drive the discretionary-function inquiry.  A court must first zero in on the conduct that supposedly caused the harm.  See, e.g., Fothergill v. United States, 566 F.3d 248, 252 (1st Cir. 2009).  Next the court must ask whether the harm-producing conduct itself is discretionary, knowing that when a "statute, regulation, or policy" actually dictates "a course of action," the agent has no choice but to follow the "directive." Berkovitz v. United States, 486 U.S. 531, 536 (1988); accord Fothergill, 566 F.3d at 253 (also adding that "[i]n carving out the discretionary function exception, Congress wanted to prevent courts from second-guessing legislative and administrative

-6-

decisionmaking").  If the conduct does involve choice, then the court must ask "whether the exercise or non-exercise of the granted discretion is actually or potentially" affected by policy-related judgments.  Fothergill, 566 F.3d at 252 (citing Bolduc and Shansky).  Of course the law presumes that discretionary acts involve policy judgments.  See, e.g., Bolduc, 402 F.3d at 62 (citing, among other cases, United States v. Gaubert, 499 U.S. 315, 324 (1991)).  Anyway, "yes" answers to both questions mean the discretionary-function exception holds sway and sovereign immunity blocks the litigation.  But a "no" answer to either question means the exception does not apply and the suit may continue.

As for the harm-producing conduct, Mahon basically complains about Boston Park's (alleged) failure to deal with the "threat" created by the portico's "dangerously low railing."  Cf. Fothergill, 566 F.3d at 253 (explaining that the discretionary-function exception pivots "on the nature and quality of the harm-producing conduct, not on the plaintiffs' characterization of that conduct").  He then makes the following multifaceted argument (sort of a reprise of what he argued below):  (1) The contracts involving Boston Park, Eastern National, and Amelia Occasions are concession contracts.  (2) Consistent with section 10.2.4.8 of the Service's policy manual, Eastern National and Amelia Occasions had to generate a risk-management plan — a plan that Boston Park had to accept.  (3) But Boston Park let Eastern National and Amelia

-7-

Occasions get away without writing one. (4) And a "proper plan" would have highlighted the low-railing situation and proposed solutions (raising the railing's height, using potted plants or ropes to keep visitors away from the railing, etc.), leaving Boston Park no choice but to implement what would have been the plan's proposed fixes.

"The simplest way to decide a case is often the best," we have said. Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013) (quoting Chambers v. Bowersox, 157 F.3d 560, 564 n.4 (8th Cir. 1998) (R. Arnold, J.)). That is true here, as the district judge showed. And that way leads straight to affirmance.

Whether the much-discussed contracts are concession contracts is an interesting question. But it is one we need not tackle. You see, even assuming for argument's sake that these are concession contracts requiring risk-management assessments, that Eastern National and Amelia Occasions had prepared reports that touched on the railing issue, and that Boston Park then opted not to implement their recommendations, Mahon's discretionary-function theory still fails.

On the first question posed by our test, Mahon flags no discretion-restraining statute, regulation, or policy that compels Boston Park to adopt a concessioner's risk-management proposals, whether they be increasing the railing's height, plunking down

-8-

potted plants or stringing up rope to stop visitors from getting to the railing — or anything else, for that matter. He makes much of the fact that the policy manual requires Boston Park to review and approve a concessioner's risk-management program. But he identifies nothing there (or elsewhere) suggesting that Boston Park must carry out whatever changes a concessioner pushes. Also problematic for him is this: Even the manual on which he pins his hopes says (in section 8.2.5.1) that the Service's policies do not impose park-specific visitor-safety requirements, noting, for example, that "safeguards" like "railings" might "not be appropriate or practicable in a national park setting." "Park visitors," it adds, "must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments." And, perhaps most importantly, while saving lives is unquestionably a priority, the Service and its functionaries have "discretion" in carrying out that task, the manual stresses.[4]

---

[4] Here is how that section pretty much appears in the policy manual:

> The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. . . .
>
> . . . When practicable and consistent with congressionally designated purposes and mandates, the Service will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education. In doing so, the

What we just said undoes Mahon's theory that the government's hands are tied on this subject. In other words, given the record here, the decision whether to implement concessioner-generated risk-management recommendations involves choice. And that means that the complained-of conduct — essentially, how the government "manage[s] risks" (to quote Mahon) — is the product of discretion. See, e.g., Fothergill, 566 F.3d at 253; Bolduc, 402 F.3d at 61; Shansky, 164 F.3d at 691.

That leaves this question: Is the discretion policy-driven — that is, is it fueled by "variables about which reasonable persons can differ"? See Fothergill, 566 F.3d at 253. The law presumes that it is, as we said a few paragraphs ago. See, e.g., Bolduc, 402 F.3d at 62. It was up to Mahon, then, to rebut that presumption. See, e.g., id. This he has not done. Which is not

---

Service's preferred actions will be those that have the least impact on park resources and values.

. . . Park visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments.

These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. Examples include decisions about whether to . . . install guardrails and fences . . . . Some forms of visitor safeguards typically found in other public venues — such as fences [and] railings . . . — may not be appropriate or practicable in a national park setting.

surprising.  After all, deciding what if any changes to make or precautions to take at the Commandant's House requires a balancing of competing values — "efficiency, safety, aesthetics, and cost" come quickly to mind.  See Fothergill, 566 F.3d at 253.  And that is the stuff of policy analysis.  See, e.g., id.; Shansky, 164 F.3d at 695.

But above and beyond this unrebutted presumption, we note that the government also put on affirmative evidence that decisions concerning the railing's height implicated policy judgments. Specifically, the government noted that a contractor working on the portico months after Mahon's accident said that the railing did not comply with the Massachusetts building code's 42-inch height requirement.  Despite the contractor's concerns about safety, the government chose not to bump up the railing's height to 42 inches because doing so would have altered the historic appearance of the Commandant's House.

The bottom line, then, is that the government's discretion here is deeply rooted in policy considerations.  And Cope v. Scott, 45 F.3d 445 (D.C. Cir. 1995), does not change matters, despite what Mahon says.  Cope got hurt in a car accident on a road in a park maintained by the Service.  Id. at 446-47. Suing the government, he alleged in part that the Service's failure to post sufficient warning signs at a dangerous curve had caused the mishap.  Id.  Among other things, the Cope court stressed that

the Service already had put up nearly two dozen traffic devices and signs along the drive — steps that suggested that the Service had already made the policy choice to choose safety over aesthetics. See id. at 452; see also Shansky, 164 F.3d at 694 (discussing Cope). Critically, too, the government could not point to a sufficient policy basis to justify not adding more or different signs — signs that could have ensured that the Service's already-taken safety steps worked better. Cope, 45 F.3d at 452. To put this slightly differently, the government there never explained how the placement of additional signs involved protected discretionary decisions. Id. That is worlds apart from our case. So Cope does not help Mahon.

### Summing Up

Mahon's injuries are truly saddening. Yet "hard as our sympathies may pull us, our duty to maintain the integrity of the substantive law pulls harder." Medina-Rivera v. MVM, Inc., 713 F.3d 132, 138 (1st Cir. 2013) (quoting Turner v. Atl. Coast Line R.R. Co., 292 F.2d 586, 589 (5th Cir. 1961) (Wisdom, J.)). And having concluded that the FTCA's discretionary-function exception bars Mahon's claims against the government (no matter how strong they are), we must uphold the district judge's order dismissing the case for lack of subject-matter jurisdiction.

**Affirmed.  No costs to either party.**