**Dr. Thomas HARDIMAN, Affiliated Foot Care, PC, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civil Action No. 11–12181–RBC.[1]**

United States District Court,
D. Massachusetts.

May 23, 2013.

---

1. With the parties' consent, on March 29, 2013, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

John Mark Dickison, Joshua M.D. Segal, Michael Williams, Lawson & Weitzen, LLP, Boston, MA, for Plaintiffs.

Michael P. Sady, United States Attorney's Office, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS (# 13)

·COLLINGS, United States Magistrate Judge.

#### I. Introduction

On December 9, 2011, plaintiffs Dr. Thomas Hardiman ("Hardiman") and Affil-

iated Foot Care, PC ("AFC") filed a three-count complaint (# 1) against the United States and Martin Flynn in his individual and official capacity. On June 28, 2012, Hardiman and AFC voluntarily dismissed Martin Flynn as a defendant in the case (# 12), and also voluntarily dismissed Count III, a strict liability claim (# 11). The remaining claims in the complaint are filed pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, and arise out of two allegedly negligent omissions by the United States Probation Service committed "under circumstances where the United States, if a private person, would be liable to the plaintiffs in accordance with the laws of the Commonwealth of Massachusetts." (# 1 ¶ 6) Count I is a claim for negligence; Count II is a claim for negligent infliction of emotional distress.

In lieu of answering the complaint, the United States has filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim for which relief can be granted (# 13) together with a memorandum of law (# 14). Hardiman and AFC, in turn, have filed an opposition (# 21) to the United States' motion to dismiss. The United States filed a reply memorandum with three attached exhibits. (# 27) On October 3, 2012, oral argument on the dispositive motion was heard and the matter was taken under advisement. On April 12, 2013, in response to a Procedural Order issued on April 1, 2013, the United States filed a copy of the April 12, 2010 Physical Security Criteria for Federal Facilities (# 39) under seal for the Court's *in camera* review. At this juncture, the motion to dismiss stands ready for decision.

## II. The Facts

The facts of this case, taken in the light most favorable to the plaintiffs, are as follows. Hardiman owned and operated AFC, a podiatry service that leased premises at 116 Long Pond Road ("Long Pond Road Building") in Plymouth, MA. (# 1 ¶ 9) The United States also leased office space at the Long Pond Road Building where it operated a United States Probation and Parole Office. (# 1 ¶ 11) On October 4, 2010, James A. Dix ("Dix"), a convicted arsonist and federal probationer, reported to Flynn, his federal probation officer, at the Probation and Parole Office for services. (# 1 ¶¶ 18, 19, 24) Dix informed Flynn that he, Dix, was in the process of being evicted, had violated his probation, and requested to be arrested. (# 1 ¶ 24) When Flynn refused to arrest Dix, Dix "became angry, again demanded to be arrested, and then stated, '[d]o I have to start a fire and be standing right there in order to get some attention?'" (# 1 ¶ 24)

In response to Dix's behavior, officers at the Probation and Parole Office contacted local police and reported that Dix was unruly and might need mental health services, but did not inform the local police of Dix's threat of arson. (# 1 ¶ 26) Officers at the Probation and Parole Office also "took no additional steps to protect or secure their premises or that of neighboring premises at the Long Pond Road Building such as AFC." (# 1 ¶ 27) The local police took Dix to Jordan Hospital for a mental health evaluation and he was released from the hospital on the same day. (# 1 ¶ 26)

On October 4, 2010, immediately after being released from Jordan Hospital, Dix drove to a gas station where he purchased $2.50 worth of gas. (# 1 ¶ 28) He then drove back to the Probation and Parole Office at the Long Pond Road Building where he "broke a window at the building, tossed in the container of gas and set it on fire by throwing a burning napkin through the window." (# 1 ¶ 28) The fire spread

throughout the Long Pond Road Building and destroyed AFC's office and virtually all of the property at the office. (# 1 ¶ 28) Dix waited for the police at the scene and, when they arrived, told them "I did this." (# 1 ¶ 29)

Hardiman and AFC allege that the United States "knew or should have known that there was a significant risk that Dix, a convicted arsonist who is suspected of [committing] over 40 arsons, would damage the Long Pond Road Building after arriving at the premises in an agitated mental state and threatening to set fire to the building." (# 1 ¶ 34) The plaintiffs contend that the United States owed a duty to them "to exercise reasonable and ordinary care to protect the AFC premises at the Long Pond Road Building from attack on October 4, 2011 [sic] after Dix had made a threat to Flynn that Dix would burn down the Long Pond Road Building that day." (# 1 ¶ 35) It is alleged in Count I that the United States was negligent in failing to notify the "local police on October 4, 2010 that Dix had specifically threatened to set fire to the Long Pond Road Building" and for failing to take any steps to monitor the Long Pond Road Building after Dix's threat. (# 1 ¶ ¶ 36, 37)

Count II sets forth a claim for negligent infliction of emotional distress. Hardiman and AFC allege that the defendant's failure to notify the police of Dix's threat of arson and failure to take additional steps to monitor the Long Pond Road Building were the direct and proximate cause of Hardiman's emotional distress. (# 1 ¶¶ 41, 43) Hardiman and AFC claim to have suffered damages in the amount of "at least $401,914.31" consequent to the negligence of the United States. (# 1 ¶ 40)

### III. Standard of Review

*A. The Rule 12(b)(1) Motion to Dismiss*

■ In its Rule 12(b)(1) motion to dismiss, the United States contends that the Court lacks subject matter jurisdiction because the allegedly negligent conduct falls under the discretionary function exception of the FTCA and is therefore expressly excluded from the FTCA's waiver of sovereign immunity. Pursuant to Rule 12(b)(1), Fed.R.Civ.P., a defendant may move to dismiss an action based on lack of federal subject matter jurisdiction. Because federal courts are considered courts of limited jurisdiction, "[t]he existence of subject-matter jurisdiction 'is never presumed.'" *Fafel v. Dipaola*, 399 F.3d 403, 410 (1st Cir.2005) (quoting *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir.1998)). Rather, "'the party invoking the jurisdiction of a federal court carries the burden of proving its existence.'" *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995), *cert. denied*, 515 U.S. 1144, 115 S.Ct. 2581, 132 L.Ed.2d 831 (1995) (quoting *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir.1993), *cert. denied*, 510 U.S. 823, 114 S.Ct. 82, 126 L.Ed.2d 50 (1993)); *Johansen v. U.S.*, 506 F.3d 65, 68 (1st Cir.2007). Once a defendant challenges the jurisdictional basis for a claim under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction. *Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942); *Johansen*, 506 F.3d at 68.

■ In ruling on a motion to dismiss for lack of subject matter jurisdiction, it is incumbent upon the court to "'credit the plaintiffs well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor.'" *Sanchez ex rel. D.R.-S. v. U.S.*, 671 F.3d 86, 92 (1st Cir.2012) (quoting *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir.2010)), *cert. denied*, —— U.S. ——, 133 S.Ct. 1631, 185 L.Ed.2d 615 (2013). The First Circuit has explained the principles at play in the well-pled complaint rule:

In resolving a motion to dismiss, a court should employ a two-pronged approach. It should begin by identifying and disregarding statements in the complaint that merely offer legal conclusion[s] couched as ... fact or [t]hreadbare recitals of the elements of a cause of action. A plaintiff is not entitled to proceed perforce by virtue of allegations that merely parrot the elements of the cause of action. Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible. If that factual content, so taken, allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, the claim has facial plausibility. The make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.

Although evaluating the plausibility of a legal claim requires the reviewing court to draw on its judicial experience and common sense, the court may not disregard properly pled factual allegations, even if it strikes a savvy judge that actual proof of those facts is improbable. Nor may a court attempt to forecast a plaintiff's likelihood of success on the merits; a well-pleaded complaint may proceed even if ... a recovery is very remote and unlikely. The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint.

*Ocasio–Hernandez v. Fortuno–Burset,* 640 F.3d 1, 12–13 (1st Cir.2011) (internal citations, parentheticals and quotation marks omitted).

Further, the "court may also 'consider whatever evidence has been submitted, such as the depositions and exhibits submitted.'" *Merlonghi v. United States,* 620 F.3d 50, 54 (1st Cir.2010) (quoting *Aversa v. United States,* 99 F.3d 1200, 1210 (1st Cir.1996)); *Carroll v. U.S.,* 661 F.3d 87, 94 (1st Cir.2011) ("In evaluating a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, we construe plaintiffs' complaint liberally and ordinarily may consider whatever evidence has been submitted, such as ... depositions and exhibits." (internal citation and quotation marks omitted)). That being said, a plaintiff cannot assert a proper jurisdictional basis "merely on 'unsupported conclusions or interpretations of law.'" *Murphy,* 45 F.3d at 522 (quoting *Washington Legal Foundation v. Massachusetts Bar Foundation,* 993 F.2d 962, 971 (1st Cir. 1993)); *Johansen,* 506 F.3d at 68.

## B. The Rule 12(b)(6) Motion to Dismiss

The United States also seeks dismissal under Rule 12(b)(6), the defendant arguing that Hardiman and AFC have failed to state a claim for which relief can be granted because they have failed to allege facts that would establish a valid claim of negligence under Massachusetts law.

A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a claim. In deciding such a motion, a court must "'accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor.'" *Haley v. City of Boston,* 657 F.3d 39, 46 (1st Cir.2011) (quoting *Artuso v. Vertex Pharm., Inc.,* 637 F.3d 1, 5 (1st Cir.2011)). When considering a motion to dismiss, a court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Id.* at 46 (citing *In re Colonial Mortg. Bankers Corp.,* 324 F.3d 12, 15 (1st Cir.2003)). The First Circuit has held that "[d]ismissal for fail-

ure to state a claim is appropriate if the complaint fails to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan,* 513 F.3d 301, 305 (1st Cir.2008) (internal quotation marks and citations omitted).

In order to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The "obligation to provide the grounds of [the plaintiff's] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* at 555, 127 S.Ct. 1955 (quotation marks omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and to cross the "line from conceivable to plausible." *Id.* at 555, 570, 127 S.Ct. 1955.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). However, the court is " 'not bound to accept as true a legal conclusion couched as a factual allegation.' " *Id.* at 678, 129 S.Ct. 1937 (citation and further internal quotation marks omitted). Simply put, the Court should assume that well-pleaded facts are genuine and then determine whether such facts state a plausible claim for relief. *Id.* at 678–679, 129 S.Ct. 1937.

## IV. Discussion

### A. The Discretionary Function Exception

The United States contends that the Court lacks subject matter jurisdiction over plaintiffs' FTCA claims because the conduct alleged to be negligent is protected by the discretionary function exception of the FTCA. The FTCA's waiver of sovereign immunity does not apply to "[a]ny claim based upon ... the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Title 28 U.S.C. § 2680(a). This limitation is known as the discretionary function exception and it "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). By means of this exception to the FTCA's waiver of immunity, Congress sought "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. 2755.

 Conduct is considered discretionary when it "involve[s] 'an element of judgment or choice' " for the acting employee. *See Abreu v. United States,* 468 F.3d 20, 25 (1st Cir.2006) (quoting *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (further citations omitted)). Where "the government actors in question have latitude to make decisions and choose among alternative courses of action, the conduct is discretionary." *Bolduc v. United States,* 402 F.3d 50, 61 (1st Cir.2005). If a policy "allow[s] room for implementing officials to make independent policy judgments, the discretionary function exception protects the acts taken by those officials in the exercise of this discretion." *Berkovitz v. United States,*

486 U.S. 531, 546, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). If, however, "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow ... the employee has no rightful option but to adhere to the directive." *Id.* at 536, 108 S.Ct. 1954. "[T]he discretionary function exception does not shield the conduct of an employee who *violates* a mandatory regulation. In that situation, the employee's action cannot be deemed in furtherance of the policies of the statute that the regulation implements. Nor does his conduct reflect a permissible exercise of the discretion that Congress delegated." *Abreu,* 468 F.3d at 27 (emphasis in original; citation omitted). If the conduct in question is determined not to be discretionary, "the analysis ends and the discretionary function proviso drops out of the case." *Bolduc,* 402 F.3d at 60.

 When the discretionary function exception is found to be applicable, " 'the [government] is completely immune from suit, and the claim must be dismissed for lack of subject matter jurisdiction.' " *Abreu,* 468 F.3d at 25 (quoting *Santoni v. Potter,* 369 F.3d 594, 602 (1st Cir.2004) (further citation and footnote omitted)). Further, in considering the Rule 12(b)(1) motion, the Court bears in mind that "the FTCA must be 'construed strictly in favor of the federal government, and must not be enlarged beyond such boundaries as its language plainly requires.' " *Bolduc,* 402 F.3d at 56 (quoting *United States v. Horn,* 29 F.3d 754, 762 (1st Cir.1994)). To determine the applicability of the discretionary function exception, "a court first must identify the conduct that is alleged to have caused the harm, then determine whether that conduct can fairly be described as discretionary, and if so, decide whether the exercise or non-exercise of the granted discretion is actually or potentially influenced by policy considerations." *Fother-*

*gill v. United States,* 566 F.3d 248, 252 (1st Cir.2009), *cert. denied,* 559 U.S. 1006, 130 S.Ct. 1892, 176 L.Ed.2d 365 (2010); *see also United States v. Gaubert,* 499 U.S. 315, 322–325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Berkovitz,* 486 U.S. at 539, 108 S.Ct. 1954.

### B. Applicability

Hardiman and AFC identify two omissions by the United States as the conduct that is alleged to have caused the harm. First, Hardiman and AFC allege that "the officers at the Probation and Parole Office neglected to inform local police of Dix's threats of arson." (# 1 ¶ 26) As a result of this omission, "local police merely took Dix to the Jordan hospital for evaluation of his mental illness, where he was soon released on the same day." (# 1 ¶ 26) Second, Hardiman and AFC contend that "despite Dix's specific threats of committing arson, the officers at the Probation and Parole Office took no additional steps to protect or secure their premises or that of neighboring premises at the Long Pond Road Building such as AFC." (# 1 ¶ 27) These two omissions by the United States purportedly constituted a breach of duty to Hardiman and AFC that were a direct and proximate cause of significant damages to the plaintiffs including property damage, lost business profits, extra business expenses, loss of business value, and emotional distress. (# 1 ¶ 38)

#### i. Failing to Notify the Police of Dix's Threat of Arson

 Hardiman and AFC contend that the United States' failure to notify the local police of Dix's threat of arson is not conduct that is protected by the discretionary function exception. The plaintiffs assert that Volume 8 of the *Guide to Judiciary Policy* includes mandatory requirements for probation and parole officers, including a requirement for "notifications

to third parties at risk for specific threats." (# 21 at 5–6) Hardiman and AFC further argue that the *Guide to Judiciary Policy* includes "specific guidelines for dealing with threats made by schizophrenic individuals such as Dix" and that the defendant's failure to follow these regulations constitutes the alleged negligence. (# 21 at 6)

The United States cites cases which opine that the job of probation officer inherently requires the use of a great degree of discretion. *See, e.g., Taylor v. Garwood,* 2000 WL 873300, at *4 (E.D.Pa. June 20, 2000) ("No manual could possibly be written dictating a detailed course of action on such a multifaceted and complex subject where a knowledge of the history, dynamics, and conditions of each person subject to supervision is required."). The defendant specifically contends that a probation officer's decision of whether to notify a third party of a potential threat is a discretionary and, therefore, the United States' failure to communicate Dix's threat of arson to the local police is exempted under the FTCA. (# 14 at 10–11)

In support of this argument, the United States cites the *Guide to Judiciary Policy,* Vol. 8, Part E as the controlling policy for the events that occurred at the Probation and Parole Office at the Long Pond Road Building on October 4, 2010. (# 27 at 2 and Exh. 1) More specifically, § 560.30.30(a) states that "[o]fficers must always take threats of violence against themselves or others seriously and *must respond immediately to* any indication that the individual may be suicidal or homicidal." (# 27, Exh. 1 (emphasis in original)) Further, § 560.30.30(b) lists the mandated strategies to be implemented by the officer "to ensure the safety of the offender, the community, and himself or herself," including the requirement that the officer "[n]otify

the local mental health crisis unit or local police department for a health and welfare check (e.g., to assess for emergency mental health commitment)" and "[i]mmediately notify any third party at risk." (# 27, Exh. 1)

Volume 8, Part E § 460.20 [2] of the *Guide* defines a third-party risk as a " 'reasonably foreseeable' risk of physical or financial harm to a specifically identified third party or parties." (# 27, Exh. 3) In addition, § 460.20.10 defines a "reasonably foreseeable" third-party risk as one where "the circumstances of the relationship between the offender and the third party (e.g., employer or household member) suggest the offender may act in a criminal or antisocial manner similar or related to past conduct." This section also states that "the risk must involve a specifically identified individual, which means that risk to an undefined group (such as the general public) or to a broad class of individuals (such as all children in the neighborhood) does not give rise to a duty to warn." (# 27, Exh. 3)

The United States argues that the above-referenced policies provide a probation officer with considerable discretion to determine whether to notify a third party of a threat made by an offender. Moreover, according to the defendant, even in the event that a probation officer decides to contact the local mental health crisis unit or local police department for a health and welfare check, "the *Guide* does *not* dictate what a probation officer must tell local police about a parolee when said police are summoned merely to assist in a previously obtained commitment order of a parolee to a mental health facility for a mental health and welfare evaluation." (# 27 at 2 (emphasis in original))

---

**2.** This provision is in the current *Guide.*

Underscoring the discretion afforded to a probation officer's determination of a third-party risk, the United States cites the decision in *Weissich v. United States,* 4 F.3d 810 (9th Cir.1993) where the Ninth Circuit interpreted earlier[3], yet comparable, versions of the above-described provisions of the *Guide.* In *Weissich,* a federal probationer shot and killed a local district attorney who at one time had prosecuted him. *Id.* at 12. The Court of Appeals determined that the FTCA barred a claim by the district attorney's heirs who had sued on the ground that the probation officers had negligently failed to warn the decedent about the threat posed by probationer. *Id.* The Ninth Circuit held that, pursuant to the U.S. Probation Guidelines, warning third parties of risks posed by a probationer is an inherently discretionary act because a warning is only required "where a reasonably foreseeable risk of harm to a specific third party is believed to exist." *Id.* at 814. The Appeals Court concluded that "[t]he guidelines clearly leave it to the officers' discretion to determine what is a reasonably foreseeable risk of harm to a specific third party. The determination whether a reasonably foreseeable risk exists depends upon a selective case-by-case evaluation. A 'case-by-case' evaluation presumes significant officer discretion." *Id.*

Hardiman and AFC seek to distinguish *Weissich* from the present case, pointing to the significant time gap between the probationer's threat and the execution of the threat in *Weissich* as compared with the short duration between Dix's threat of arson and his implementation of the threat by setting fire to the Long Pond Road Building. The plaintiffs also note that

*Weissich* was decided on a motion for summary judgment, presumably after sufficient discovery to determine all of the applicable regulations.

While acknowledging that the facts of *Weissich* and those of the present case are distinguishable, the Court is persuaded by the Ninth Circuit's reasoning that a United States probation officer's determination of the presence or absence of a third-party risk is a discretionary function. The *Guide* provides the requisite guidelines for responding to offender threats and bestows considerable discretion upon probation officers in determining what constitutes a third-party risk. A case-by-case application of these guidelines is clearly intended and anticipated, as the *Guide* lists several factors to consider in determining whether potential risks give rise to a " 'reasonably foreseeable' *particular* risk of physical or financial harm to a specifically identified third party or parties." *Guide to Judiciary Policy,* Vol. 8, § 350.10.30.[4] By instructing officers to consider these factors in determining whether identified risks give rise to a reasonably foreseeable third-party risk requiring third-party notification, the *Guide* clearly grants the officers discretion to make choices. With respect to the determination of third-party risks, probation officers are granted the type of "latitude to make decisions and choose among alternative courses of action" that the First Circuit recognizes as the essence of a discretionary function. *Bolduc,* 402 F.3d at 61.

Further, in the event where a probation officer decides to request police assistance with transporting an offender for a mental

---

**3.** The defendant has submitted copies of the sections of the *Guide* applicable in 2010. (# 27 at 4 and n. 5; Exh. 3) The provisions are only slightly different from those examined in *Weissich* and the current *Guide* provisions.

**4.** This provision of the *Guide* was in force in October 2010. *See* # 27 at 4.

health and welfare evaluation such as in the present case, the *Guide* does not dictate what the probation officer must disclose to local police when making such a request. With respect to the content of this request and notification, there appears to be no mandatory regulation or policy to which a probation officer must conform. *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954 ("Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive.").

For example, the *Guide* does not include a mandatory directive requiring a probation officer to disclose to local police the entire basis of the request or the offender's exact statements or criminal history. The absence of a mandatory regulation governing the content of a probation officer's notification to police with respect to this matter, and the resulting latitude in decision-making bestowed upon the probation officer, render such conduct discretionary in nature.

In sum, the *Guide's* grant of discretion to probation officers when determining a reasonably foreseeable risk of harm to a third party and the absence of a mandatory regulation governing the content of a probation officer's notification to local police when requesting transport for a mental welfare evaluation make the United States' failure specifically to notify the local police of Dix's threat of arson discretionary conduct.

Hardiman and AFC argue that the defendant's failure to inform the local police of Dix's threat of arson "did not involve public policy." (# 21 at 8) The plaintiffs cite the Ninth Circuit's holding in *Green v. United States,* 630 F.3d 1245 (9th Cir. 2011), as being illustrative. In *Green,* property owners sued the National Forest Service for failing to notify them before and after the Forest Service lit backfires which exceeded the appropriate containment area. *Id.* at 1247. The Court held that while the Park Service's failure to notify the property owners regarding the backlit fires was conduct that is discretionary in nature, "there is no evidence in the record to support the Forest Service's contention that the nature of its actions in this case—*i.e.,* its decisions when and whether to communicate directly with private citizens whose properties may have been in harm's way—are susceptible to policy analysis." *Id.* at 1252. Hardiman and AFC argue that the present case is analogous to *Green* because the defendant's failure to report Dix's threat of arson to local police "did not involve political, economic, or social considerations sufficient to demonstrate that this was a matter of public policy." (# 21 ¶ 20)

The Court finds the facts of the present case distinguishable from the facts in *Green.* First, the negligent omission in *Green* arose from events which were directly caused by the defendant's own negligent conduct, namely, the Forest Service's lighting of backfires which exceeded the appropriate containment area. In this context, the *Green* court's holding that the United States' failure to notify neighboring landowners of the backfires was not susceptible to policy analysis is unsurprising. In the present case, the allegedly negligent omission arose from events which were directly caused by an outburst and subsequent threat from a third party, Dix, who unexpectedly appeared at the United States Probation and Parole Office. In this context, it is less persuasive to argue that the probation officer's non-exercise of the granted discretion is not actually or potentially influenced by policy considerations. This is particularly true consider-

ing the policy considerations that are present in the day-to-day operations of the Probation and Parole Office, such as protecting the public, rehabilitating probationers, and wisely allocating internal and external resources, both of which may be scarce.

Second, the omission at the heart of *Green* involved a failure to warn the parties who were directly at risk, the neighboring landowners. In contrast, the omission at the heart of the present case involves the United States' failure to communicate Dix's threat of arson to the local police, not its failure to communicate this information to Hardiman or AFC. This difference is important as it affects the potential policy considerations underlying the exercise or non-exercise of the granted discretion. In the first case, it would be difficult to generate a plausible policy justification for failing to warn individuals who may be foreseeably impacted by events that were directly caused by the negligent conduct of the United States. In the second case, there may be plausible policy justifications underlying the omission, such as concerns regarding the privacy of probationers, the resources of the Probation and Parole Office, the resources of the local police, and the rehabilitation goals of the Probation and Parole Office as a whole.

The United States argues that responding to threats made by a federal probationer inherently entails policy-driven judgments. (# 14 at 19) The United States cites the holding in *Weissich* that responding to a probationer's threat, including making determinations regarding third-party risk, "necessarily involves policy decisions on matters such as public safety, allocation of scarce resources, and the likelihood of rehabilitation." *Weissich*, 4 F.3d at 814. The United States also cites *Fuller–Avent v. United States Prob. Office*, 226 Fed.

Appx. 1 (D.C.Cir.2006) (*per curiam*), which held that the discretionary function exception applied to a probation officer's alleged disclosure of the plaintiff's criminal history to her employer and Pennsylvania bar authorities during her term of supervised release because "[t]he Probation Manual reflects the competing policy considerations at stake: officers 'have an equal obligation to control risk to the public and provide correctional treatment to the offender.'" *Id.* at 3 (citation omitted).

The Court finds the holdings in *Weissich* and *Fuller–Avent* to be persuasive. A probation officer's determination of a third-party risk and his/her decision regarding what exactly to disclose to local police when submitting a request for a mental health evaluation clearly involve policy decisions and competing policy considerations. To conclude otherwise would be to second-guess the Probation and Parole Office's policy decision and, consequently, would be contradicting the clear intent of the discretionary function, which is "to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy.'" *Berkovitz*, 486 U.S. at 536–537, 108 S.Ct. 1954 (quoting *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. 2755). Such a conclusion would also seriously handicap efficient government operations. In short, the defendant's failure to notify the local police of Dix's threat of arson is conduct that is susceptible to policy analysis.

### ii. Failing to Monitor the Long Pond Road Building After Dix's Threat

Hardiman and AFC argue that the United States' failure to undertake additional monitoring of the Long Pond Road Building after Dix's threat of arson is not conduct protected by the discretionary function exception. The plaintiffs contend that the defendant's duty to monitor the building after Dix's threat was regulat-

ed by the Interagency Security Committee ("ISC"), a division of the Department of Homeland Security that is mandated " 'to enhance the quality and effectiveness of physical security in, and the protection of buildings and nonmilitary Federal Facilities in the United States.' " (# 21 at 7 (citation omitted)) Hardiman and AFC rely on two documents promulgated by the ISC, the *Design Basis Threat Report* ("DBT Report") and *The Physical Security Criteria for Federal Facilities* ("PSC"). (# 21 at 7) Although these documents are not classified, purportedly "they are for official use only and not generally available to the public." (# 21 at 8) The plaintiffs assert, on information and belief, that "these documents together mandate particular steps that the defendant must take when presented with specific threats" and "[i]f the defendant followed the ISC's requirements, it would have conducted surveillance in light of Dix's threat." (# 21 at 8)

The DBT Report is a "profile of the type, composition, and capabilities of adversaries" and is "designed to correlate with the countermeasures contained in the Physical Security Criteria for Federal Facilities." Interagency Security Committee, http://www.dhs.gov/interagency-security-committee-standards-and-best-practices (last visited Nov. 14, 2012). The DBT Report provides "an estimate of the threat facing Federal facilities across a range of undesirable events." (# 21 at 7 (citation omitted)) While apparently not available on the Department of Homeland Security's website, a basic Google search for "Design Basis Threat Report" produces a website containing what appears to be the April 2010 DBT Report. http://info.public intelligence.net/DHS–DesignBasisThreat. pdf (last visited Nov. 14, 2012). The defendant has confirmed that the April 2010 DBT Report produced by the basic Google search is the complete and authentic April

2010 DBT Report on which the plaintiffs rely. (# 40)

Since the alleged negligent conduct in this case occurred on October 4, 2010, the April 2010 DBT Report presumably governed the United States Probation and Parole Office at the Long Pond Road Building at that time. The April 2010 DBT Report states that the DBT Report "is an *estimate* of the threat that faces Federal facilities across a range of undesirable events ...". *Design Basis Threat (U): An Interagency Security Committee Report,* April 12, 2010 at 3 (emphasis in original). Under the title "How to Apply This Report," the DBT Report states:

The Design–Basis Threat (DBT) establishes the characteristics of the threat environment to be used in conjunction with Interagency Security Committee physical security standards.

The intent of the DBT is three-fold:

- To inform the deliberations of ISC working groups as they establish standards;

- To support the calculation of the threat, vulnerability, and consequence to a facility when calculating risk to a Federal facility and determining an appropriate Level of Protection, particularly when applying ISC's 'Physical Security Criteria for Federal Facilities;' and,

- To determine specific adversary characteristics that performance standards and countermeasures are designed to overcome.

*Id.* at 5.

The DBT Report further provides that "[s]pecific security requirements—expressed in performance terms where possible—are to be developed by the government based on the Design–Basis Threat (DBT) and provided to design consultants." *Id.* at 3.

The DBT Report does not appear to promulgate any mandatory regulations or directives regarding the security standards for federal facilities. Rather, it provides a description and estimate of the various man-made threats to federal facilities, including arson, to be considered in the development and implementation of security regulations, including the ISC's Physical Security Criteria for Federal Facilities.

Although the DBT Report lists the Baseline Threat of arson to be "HIGH," it does not appear to promulgate any mandatory regulations or directives to which federal facilities must adhere in light of this Baseline Threat determination or in response to general or specific threats of arson at a specific federal facility. *Id.* at 7.21. In fact, the DBT Report appears to provide discretion to each federal facility in determining the nature and severity of the threat and risk of arson. The DBT Report specifically states that "in estimating the threat level, specific information unique to the facility or the locale may be used. Local crime statistics, the tactics of adversary groups known to be operating in a particular area, and other actionable intelligence that suggests a different threat level may modify the threat from the baseline." *Id.* at 6.

In the absence of a mandatory regulation or policy and in view of the DBT Report's express permission to consider specific information unique to the facility when estimating a particular facility's threat level, the decision or failure to conduct additional monitoring of the Long Pond Road Building after Dix's threat of arson involved an element of judgment or choice and latitude to choose among alternative courses of action. Therefore, in the context of the DBT Report, conducting additional monitoring of the Long Pond Road Building after Dix's threat is conduct that is discretionary in nature.

The PSC, the second document Hardiman and AFC cite as a binding security policy, " 'establishes a baseline set of physical security measures to be applied to all Federal facilities and provides a framework for the customization of security measures to address unique risks at a facility.' " (# 21 at 7 (citation omitted)) The PSC's baseline measures "provide comprehensive solutions in all five areas of physical security, including site, structural, facility entrance, interior, security systems, and security operations and administration." Interagency Security Committee Standards and Best Practices, http://www.dhs.gov/interagency-security-committee-standards-and-best-practices (last visited Nov. 14, 2012).

The United States argues that the PSC does not prescribe specific day-to-day operational activities and does not include "mandatory guidelines ... that would mandate specific conduct which every federal employee must implement during their day-to-day operations when confronted with the circumstances at hand." (# 27 at 6 n. 8) The United States points out that Executive Order 12977 of 1995, the Order creating the Interagency Security Committee ("ISC"), "specifically maintains that it is not intended to create any private right of action against the United States." (# 27 at 6 n. 8; Exh. 2)

The defendant's reliance on the language included in the Executive Order creating the ISC is flawed. The notation in Executive Order 12977 indicates *"[t]his order* is intended only to improve the internal management of the Federal Government, and is not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or its employees." (# 27, Exh. 2, Sec. 7 (emphasis added)) This section of the Executive Or-

der notation does not indicate that the regulations or policies promulgated by the agency created by the Order, the ISC, do not create a private right of action. Therefore, it is plausible, in the event that the policies and regulations promulgated by the ISC are mandatory, that a private action could be brought against the United States for the violation of those policies and regulations.

That having been said, after reviewing the PSC *in camera,* the Court finds that this document is comparable in character to the DBT Report. Generally speaking, the PSC concludes that a single "approach in applying security standards" in federal facilities should be followed with the goal to mitigate risks to the facilities and personnel. (# 39 at 3) The United States is correct in arguing that the PSC does not address specific day-to-day agency operational activities at all. The document includes no regulations or policies that would mandate specific surveillance activities in response to Dix's threat of arson. The PSC simply is not a mandatory directive that would have required additional monitoring of the Long Pond Road Building after Dix's threat as the defendants contend.

██ The third and final step in the discretionary function analysis is to determine whether the exercise or non-exercise of the granted discretion is actually or potentially influenced by policy considerations. *Bolduc,* 402 F.3d at 60. The discretionary function exception immunizes conduct of government employees that arises from " 'legislative and administrative decisions grounded in social, economic, and political policy,' " protecting against " 'liability that would seriously handicap efficient government operations.' " *Wood v. United States,* 290 F.3d 29, 36 (1st Cir. 2002) (quoting *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. 2755 and *United States v.*

*Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963)). Conduct is susceptible to policy analysis if "some plausible policy justification could have undergirded the challenged conduct." *Shansky v. United States,* 164 F.3d 688, 692 (1st Cir. 1999). The Supreme Court has held that when the conduct forming the basis of the alleged negligence is discretionary, there is a presumption that the exercise or non-exercise of the discretion is grounded in policy:

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.

*Gaubert,* 499 U.S. at 324–325, 111 S.Ct. 1267.

The United States argues that its decision not to monitor the Long Pond Road Building was a discretionary act "grounded in policy considerations and is therefore exempted from the FTCA's waiver of sovereign immunity." (# 14 at 13) In the context of the DBT Report, the Court concludes that the defendant's alleged failure to take additional steps to monitor the Long Pond Road Building after Dix's threat was indeed grounded in policy considerations. While the DBT Report provides an estimate baseline threat level, it also appears to provide considerable discretion to each federal facility in determining the nature and severity of threats such as arson. Again, it specifically states that "[i]n estimating the threat level, specific information unique to the facility or the

locale may be used. Local crime statistics, the tactics of adversary groups known to be operating in a particular area, and other actionable intelligence that suggests a different threat level may modify the threat from the baseline." *Design Basis Threat Report (U): An Interagency Security Committee Report*, April 12, 2010 at 6. These criteria indicate that the baseline threat and, possibly, the appropriate response and surveillance to be conducted in response to a specific threat, are susceptible to policy analysis.

Similar policy considerations are present in the context of the PSC. By definition in the document, the Interagency Security Committee Standard "defines a process for determining the security measures required by a facility." (# 39 at 4) The identification of threats and vulnerabilities are to be undertaken on a case-by-case basis, and "informed risk-based decision[s] regarding the mitigation or acceptance of risk" are to be made. (# 39 at 15) Among other things, the costs to mitigate risks to an acceptable level are to be factored into the decisionmaking. Like the DBT Report, the PSC appears to provide considerable discretion to each federal facility in determining the nature and severity of threats such as arson when applying the Interagency Security Committee Standard. As in the case of the DBT Report, the Court finds that the alleged failure of the United States to take additional steps to monitor the Long Pond Road Building after Dix's threat was grounded in policy considerations.

The Court need go no further. Based on the foregoing analysis, the conduct alleged by the plaintiffs to be negligent is protected by the discretionary function exception of the FTCA. As a consequence, the Court lacks subject matter jurisdiction over the plaintiffs' FTCA claims and the complaint must be dismissed.

## V. Conclusion and Order

For all of the reasons stated, it is ORDERED that Defendant's Motion To Dismiss (# 13) be, and the same hereby is, ALLOWED and that the plaintiffs' complaint be, and the same is, DISMISSED for lack of subject matter jurisdiction. Judgment shall enter for the defendant.